491 F.Supp. 1188 (1980)
Charles W. DEPENDAHL, Jr., et al., Plaintiffs,
v.
FALSTAFF BREWING CORPORATION et al., Defendants.
John C. CALHOUN, Plaintiff,
v.
FALSTAFF BREWING CORPORATION et al., Defendants.
Nos. 75-701C(2), 76-24C(2).
United States District Court, E. D. Missouri, E. D.
June 9, 1980.
*1189 Harry B. Wilson, Jr., Carroll J. Donohue, Husch, Eppenberger, Donohue, Elson & Cornfeld, St. Louis, Mo., for plaintiffs.
Theodore F. Schwartz, St. Louis, Mo., for defendants.

MEMORANDUM
NANGLE, District Judge.
Plaintiffs brought these actions alleging violations of the Employee Retirement Income Security Act of 1974, 29 U.S.C. §§ 1001 to 1144, as well as common law fraud and tortious interference with contractual relations.
These cases were consolidated and tried before this Court without a jury. This Court having considered the pleadings, the testimony of the witnesses, the documents in evidence, the stipulations of the parties, and being fully advised in the premises hereby makes the following findings of fact and conclusions of law as required by Rule 52, Federal Rules of Civil Procedure.

FINDINGS OF FACT
1. Defendant Falstaff Brewing Corporation ("Falstaff") is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business in the State of California. It is actively engaged in interstate commerce.
*1190 2. Defendant Paul Kalmanovitz ("Kalmanovitz") is a resident of the State of California. Since on or about April 28, 1975, Kalmanovitz has been controlling shareholder in Falstaff, and has personally run its operations, acting as if he alone owned the corporation.
3. Plaintiff Charles W. Dependahl, Jr. ("Dependahl") is a resident of the State of Missouri. Except for a military leave of absence during World War II, he was employed by Falstaff from January 1, 1937 until May 1, 1975. From November, 1972 until his discharge, Dependahl was Vice President, Director of Marketing for Falstaff. At the time of his discharge, Dependahl's salary was forty-five thousand dollars ($45,000.00) per year.
4. Plaintiff William S. Healy ("Healy") is a resident of the State of Missouri. He was employed by Falstaff from July 7, 1936 until May 1, 1975. From November, 1972 until his discharge, Healy was Vice President, Secretary and Treasurer for Falstaff. At the time of his discharge, Healy's salary was forty-five thousand dollars ($45,000.00) per year.
5. Plaintiff John C. Calhoun ("Calhoun") is a resident of the State of Missouri. He was employed by Falstaff from July 5, 1966 until August 8, 1975. From November, 1972 until his discharge, Calhoun was Comptroller for Falstaff. Additionally, Calhoun served as Secretary and Treasurer of Falstaff from May 1, 1975 until early July, 1975. Calhoun's salary was thirty-two thousand dollars ($32,000.00) per year.
6. In 1953, Falstaff adopted the Falstaff Brewing Corporation Retirement Plan for Salaried Employees ("Pension Plan"). This Plan was revised in 1970. Under the terms of the plan, as revised, an employee's benefits become vested upon ten years employment with the Corporation. Plaintiffs Dependahl and Healy are presently receiving their benefits under the Plan. Plaintiff Calhoun was not employed by Falstaff for ten years, and therefore is not receiving benefits under the Plan.
7. Prior to 1953, Falstaff purchased life insurance policies on covered employees, those employees holding a vested interest in the policies. Dependahl has requested, but has yet to receive, the cash value of pre-1953 policies issued by the Travelers Insurance Company. The paid-up value of these policies is five thousand five hundred ninety-eight dollars ($5,598.00).
8. The Falstaff Severance Policy No. III-50 ("Severance Policy") was duly adopted by Falstaff on March 1, 1973, and was in effect at the time of the discharges of Dependahl and Healy. This Policy was included in the Falstaff Policy Manual which was circulated to all employees.
9. Under the terms of this Severance Policy, upon involuntary termination of employment with Falstaff, an employee is entitled to one week's salary for each completed year of service, up to a maximum of twenty-six weeks' salary. These benefits are completely forfeited if the employee is terminated involuntarily for violations of normal decency, such as fighting or gross insubordination. If the employee is terminated involuntarily due to "inadequate performance or similar reasons controllable by the employee", the employee is entitled to two weeks' salary as severance pay.
10. The Severance Policy was amended in June, 1975 to provide that no benefits are payable unless the employee had been with Falstaff for at least fifteen years. The Policy was changed at Kalmanovitz's direction, in anticipation of mass firings of Falstaff employees, in order to deprive Falstaff employees of their rightfully entitled benefits.
11. On December 19, 1966, Falstaff adopted a death benefit plan for key employees which entailed the purchase of split-dollar insurance policies on the lives of the employees covered. On December 27, 1972, this split-dollar plan was replaced with a plan entitled the Contractual Benefit Plan for Survivors of Selected Executives of Falstaff Brewing Corporation ("CBS Plan"). Under the terms of this Plan, the named beneficiaries of the executive are to receive annuity income benefits upon the executive's death, with Falstaff recovering the *1191 annual premiums previously paid, with interest. Benefits are forfeitable upon discharge for proper cause, which includes, but is not limited to, failure to perform assigned duties with reasonable skill and diligence, gross misconduct or conviction of a felony.
12. This Plan is funded through the purchase, by Falstaff, of life insurance policies on the lives of the approximately twelve to fifteen executives covered by the Plan. Initially, the premiums were paid through utilization of the cash values of the previous split-dollar policies. Since the adoption of the CBS Plan, Falstaff has occasionally borrowed against the cash value of the policies purchased pursuant to the Plan to make premium payments thereunder.
13. Under the CBS Plan, life insurance in the amount of three hundred fifty thousand dollars ($350,000.00) was purchased on the life of Dependahl, four hundred thousand dollars ($400,000.00) on the life of Healy, and two hundred fifty thousand dollars ($250,000.00) on the life of Calhoun. Each plaintiff executed a separate Death Benefit Agreement with Falstaff in accordance with this Plan.
14. Plaintiffs played no significant roles in the adoption of the Severance Policy or the CBS Plan.
15. Falstaff's initial contact with Kalmanovitz came in the fall of 1974. At that time an agreement was worked out whereby Kalmanovitz's General Brewing Company purchased Falstaff's San Francisco Brewery and contracted to produce beer for Falstaff on the West Coast. At that time, Kalmanovitz indicated an interest in investing in Falstaff in the future.
16. Later in the fall of 1974 Falstaff was experiencing severe financial problems. In its search for an infusion of new capital, Kalmanovitz was contacted. A series of meetings between Kalmanovitz and Falstaff executives culminated in an agreement dated March 10, 1975 whereby Kalmanovitz, in return for voting control of Falstaff, would invest ten million dollars ($10,000,000.00) in Falstaff preferred stock, and would personally guarantee ten million dollars ($10,000,000.00) of Falstaff's debts. This agreement quite likely saved Falstaff from financial collapse.
17. Negotiating on behalf of Falstaff were Ferdinand Gutting, Arthur Tonna, and James McClellan. Plaintiffs had no contact with Kalmanovitz or his representatives during the course of the negotiations.
18. During the course of the negotiations Kalmanovitz represented to the Falstaff negotiators, in general terms, that he was satisfied with the basic operations of Falstaff and that no drastic changes would be made. He further stated that he would be involved only in major policy decisions and not the day-to-day operations of Falstaff. These statements were clearly false when made, as Kalmanovitz intended from the very beginning to run Falstaff as his personal fiefdom and drastically alter its operations. However, though Kalmanovitz told Gutting that Gutting would be retained, there is no evidence that Kalmanovitz ever stated that plaintiffs would be retained after the takeover.
19. The agreement with Kalmanovitz called for the issuance of a new series of preferred stock. To consummate this agreement, the Articles of Incorporation had to be amended with stockholder approval. A stockholders' meeting was held on April 28, 1975, at which time the Kalmanovitz deal was approved by the stockholders.
20. Prior to this meeting, Dependahl and Healy made extensive efforts to rally support for the agreement among the stockholders. Due to the importance of the agreement and the shortness of time prior to the meeting, the efforts made by Dependahl and Healy were more extensive and concentrated than usual. These efforts were expended by these plaintiffs while acting under the mistaken, although understandable, assumption that they would be retained after Kalmanovitz took over.
21. Dependahl first met Kalmanovitz at a dinner meeting on April 27, 1975. At this meeting, Kalmanovitz discussed several items with Dependahl. Kalmanovitz was *1192 unimpressed with Dependahl's knowledge of the legal and marketing aspects of beer sales, and was unhappy with Dependahl's independence of ideas and refusal to blindly agree to all Kalmanovitz said. Kalmanovitz decided to terminate Dependahl at this time.
22. After this dinner meeting, while discussing with Tonna the possibility of firing a large number of Falstaff employees, Kalmanovitz was first made aware of the existence of the Severance Policy. Even though it was late at night, he ordered that he immediately be shown a copy of the Policy. The next morning Kalmanovitz inquired of McClellan, Falstaff's counsel, whether the Policy was legally binding and enforceable, and whether it could be terminated. He was advised that it was binding and enforceable.
23. Healy first met Kalmanovitz at the meeting of the Falstaff Board of Directors which followed the stockholders' meeting of April 28, 1975. At that meeting, Healy gave a lengthy report on the financial condition of the company. Kalmanovitz was unimpressed with Healy's presentation, and dissatisfied with Healy's inability to immediately responded to Kalmanovitz's unreasonable demand to know the cash position of the company at that time. As with Dependahl, Kalmanovitz determined to terminate Healy on the basis of this first impression.
24. Upon consummation of the agreement between Kalmanovitz and Falstaff, Kalmanovitz immediately took over day-to-day operations of the company. On May 1, 1975, Dependahl and Healy, along with other executives, were discharged by Tonna on Kalmanovitz's orders. At the time of their discharge, Dependahl and Healy were informed that they would receive the maximum twenty-six weeks' of severance pay. They received four weeks' severance pay but payments were then stopped.
25. Dependahl and Healy were not discharged due to inadequate performance of their duties or for any other "cause". Quite simply, they were discharged due to a change in ownership and management and consequent change in policies and personnel.
26. After Healy's discharge, Calhoun took over the positions of Secretary and Treasurer. In these positions, as well as his retained position of Comptroller, Calhoun was charged by Kalmanovitz with the responsibility of changing the accounting system from the centralized, computerized system then in use by Falstaff to a decentralized, manual system similar to those utilized in many of Kalmanovitz's other brewery operations. Calhoun's efforts to accomplish this change did not meet with Kalmanovitz's approval. Kalmanovitz wanted the change accomplished rapidly, but Calhoun proceeded with the caution to be expected in the face of such a major corporate change.
27. Kalmanovitz's dissatisfaction with Calhoun was further magnified due to an incident involving deferral of current debts by Continental Can. Continental Can, upon personal guarantee of the debt by Kalmanovitz and his wife, agreed to a one hundred twenty day deferral of current debts. This debt amounted to approximately eleven million dollars ($11,000,000.00), which was ultimately represented by a note executed by Falstaff in mid-August, 1975. Prior to the execution of the note, however, Kalmanovitz requested Calhoun to list the debt as a long-term liability rather than a short-term debt. Without such a change, Falstaff risked default on debts to various lenders, due to conditions in the mortgages regarding current assets-current liabilities ratios. Calhoun resisted the change, maintaining that such a change was improper without an executed note. Again, this Court must believe that Calhoun's response to Kalmanovitz's demand was proper and ethical.
28. Calhoun was discharged by Tonna upon Kalmanovitz's orders on August 8, 1975. The reasons assigned for the discharge were Calhoun's actions with respect to the decentralization project and the Continental Can transaction. These reasons came into play to some extent, but the overriding consideration for Calhoun's discharge *1193 was, similar to the discharges of Dependahl and Healy, a change in management and a pre-planned change in personnel. Kalmanovitz gave Calhoun only the slightest chance to fit into the new management scheme, and when he did not fit in he was discharged. As with Kalmanovitz's first impression of Dependahl, Calhoun's insistence upon ethics and caution conflicted with Kalmanovitz's desire that his subordinates blindly follow his orders, regardless of their correctness or propriety. There is no evidence to support Calhoun's assertion that he was discharged to prevent the vesting of his pension benefits.
29. Since Calhoun had not been employed by Falstaff for fifteen years, as required by the Severance Policy as amended in June, 1975, he did not receive any severance pay from Falstaff.
30. Subsequent to the dismissal of Healy and Dependahl, Kalmanovitz maliciously, unfairly, and without any justification whatsoever directed that severance payments to them be stopped. Falstaff subsequently offered to Dependahl and Healy to resume severance payments if they would waive their interests in the CBS Plan. Dependahl and Healy refused to do so, and the severance payments were never resumed.
31. Falstaff and Kalmanovitz have consistently maintained throughout this litigation and others that the CBS Plan is not valid and binding with respect to plaintiffs. This contention is based to a large extent on various allegations of impropriety and misconduct charged to plaintiffs, which allegations have been stricken from this case due to defendants' failure to comply with discovery requests concerning these matters. See Order of December 10, 1979. 84 F.R.D. 416. In any event, this Court has serious doubts as to the bona fides of these contentions. In fact, Kalmanovitz has consistently sought to complicate this lawsuit at every chance and to delay its progress by every means possible. Clearly, these actions, as well as Kalmanovitz's original decision not to honor the CBS Plan, have been taken in an effort to force plaintiffs into submission, and in willful and wanton disregard of plaintiffs' rights.
32. Kalmanovitz was acting at all times relevant to this litigation in what he perceived to be the interest of Falstaff, and not on his own behalf. It is also apparent, however, that Kalmanovitz firmly believes that what's good for "Mr. Paul" is good for Falstaff.
33. Falstaff and Kalmanovitz exercise control over the management of the Severance Policy and CBS Plan and the disposition of any assets included therein.

CONCLUSIONS OF LAW
This Court has jurisdiction of this case pursuant to 29 U.S.C. § 1132(e)(1), and 28 U.S.C. § 1332. This case involves plaintiffs' efforts to define and enforce their rights in plans allegedly covered by the Employee Retirement Income Security Act of 1974 (ERISA), 29 U.S.C. §§ 1001 to 1144, as well as several common law counts between citizens of different states involving more than ten thousand dollars ($10,000.00).
Before proceeding to a discussion of the merits of the various counts in this action, this Court must discuss the effect to be given to numerous "admissions" on the part of defendants, which plaintiffs have placed into evidence in this case. These admissions cover every substantive element of plaintiffs' causes of action, and were these admissions given full force and effect a trial would have been totally redundant and cumulative.
Plaintiffs initially filed the request for admissions on February 28, 1978, and a response was therefore due on March 30 of that year. Prior to that date, however, plaintiffs raised the issue of a purported settlement. A hearing was held on plaintiffs' motion to enforce that settlement on April 10, 1978, and the settlement was enforced by this Court on April 18, 1978. 448 F.Supp. 813. During the pendency of an appeal of that order, plaintiffs abandoned their efforts and the settlement was vacated on February 26, 1979. 594 F.2d 869.
Though no formal stay of proceedings was entered during the course of the litigation *1194 of the "settlement" question, the parties ceased all discovery efforts. On March 9, 1979, shortly after the Eighth Circuit's remand, defendants lodged their answers to plaintiffs' requests for admissions with this Court. On June 5, 1979, defendants were granted leave to file those responses.
Plaintiffs now assert that the admissions are conclusive against defendants due to defendants' failure to file a motion to withdraw their "admissions", pursuant to Rule 36(b), Federal Rules of Civil Procedure. These "admissions" allegedly arose from defendants' failure to deny the requests within thirty days. See Rule 36(a), Federal Rules of Civil Procedure. This Court will not give such conclusive weight to the admissions.
Plaintiffs have been fully aware throughout the course of this litigation that defendants denied the substance of the admissions. The admissions go to the very heart of plaintiffs' claims, which claims were fully denied in defendants' answers to the complaint. Furthermore, defendants responded to this same set of admissions in a companion case now pending before a different judge in this district. After the filing of defendants' response in this case, plaintiffs gave no indication that they considered the matters admitted due to a lack of appropriate motion. Defendants' failure to timely deny is undoubtedly attributable in large part to plaintiffs' effort to enforce the settlement, and subsequent abandonment of that effort.
Under these circumstances it would be extremely unfair[1] to allow plaintiffs to prove the bulk of their case through these contested admissions. Though defendants never filed a formal motion to withdraw their "admissions", their denial has been obvious throughout this litigation. Furthermore, plaintiffs, despite any reliance on the admissions, placed into evidence that proof which they could garner to support their case, and the issues covered by the admissions were fully litigated. This Court has, therefore, considered the admissions as evidence in this case, but has not considered the matters included therein as conclusively established against defendants. Warren v. International Broth. of Teamsters, Inc., 544 F.2d 334 (8th Cir. 1976); Pleasant Hill Bank v. United States of America, 60 F.R.D. 1 (W.D.Mo.1973).

THE CBS PLAN
Counts I and II of both complaints seek declaratory and injunctive relief with respect to the CBS Plan. The initial issue to be decided is whether the Plan does, in fact, fall within the coverage of ERISA as plaintiffs claim. Defendants raise numerous arguments as to why the Plan does not fall within ERISA, but this Court must conclude that those arguments are without merit.
ERISA applies to any employee benefit plan established or maintained by an employer engaged in commerce. § 4 of ERISA, 29 U.S.C. § 1003. An "employee benefit plan" is an employee welfare benefit plan or an employee pension benefit plan, or a plan that is both an employee welfare benefit plan and an employee pension benefit plan. § 3(3) of ERISA, 29 U.S.C. § 1002(3).
Section 3(1) of ERISA, 29 U.S.C. § 1002(1), defines an "employee welfare benefit plan" to include
... any plan ... which was heretofore or is hereafter established or maintained by an employer ... to the extent that such plan ... was established or is maintained for the purpose of providing for its participants or their beneficiaries, through the purchase of insurance or otherwise, (A) ... benefits in the event of ... death ....
There can be no doubt that the CBS Plan was established by Falstaff to provide, through the purchase of insurance, benefits to the participants' beneficiaries upon the *1195 participants' death. The CBS Plan is clearly an employee welfare benefit plan as defined in ERISA.
Plaintiffs also argue that the CBS Plan qualifies as an employee pension benefit plan, as that term is defined in Section 3(2) of the Act. 29 U.S.C. § 1002(2). Though this Court has serious doubts as to the validity of this contention, this issue need not be decided at this time. CBS Plan is covered by ERISA due to its status as an employee welfare benefit plan, and its also being considered an employee pension benefit plan would not change the outcome of this case.
Defendants argue initially, however, that the CBS Plan is merely a series of individual agreements and not a "plan". This argument is specious. The CBS Plan was adopted by Falstaff as a unitary scheme for participation by all covered executives. Falstaff did not devise an individual death benefit agreement each time it decided that an executive should be covered. In a similar vein, defendants argue that the CBS Plan is not within ERISA because there is no single written document embodying the Plan, as required by Section 402 of the Act. 29 U.S.C. § 1102(a)(1). Defendants miss the point. If the CBS Plan falls within ERISA, as this Court concludes that it does, defendants may not avoid the requirements of that Act by merely failing to comply and then arguing that the Plan is not within the Act due to their noncompliance.
Defendants next argue that the CBS Plan is excluded from ERISA coverage as an unfunded excess benefit plan, pursuant to § 4(b)(5) of ERISA. 29 U.S.C. § 1003(b)(5). Defendants claim that the CBS Plan is an excess benefit plan since the employees are already covered by the Falstaff Pension Plan. This simplistic argument is without merit. Whether a plan is an "excess benefit plan" as defined by ERISA is determined by whether the benefits and contributions are in excess of those allowed by the Internal Revenue Code. 29 U.S.C. § 1002(36). Neither party has attempted to unravel the maze of the Internal Revenue Code, and this Court likewise finds it unnecessary to do so, for it is clear that the CBS Plan is not unfunded.
The CBS Plan is financed through the purchase of insurance policies on the lives of the key executives covered. Though ERISA does not define "unfunded", this Court must conclude that the instant plan is "funded" within the meaning of that statute. Guidance is supplied by the applicable regulations.
Section 104(a)(3) allows the Secretary of Labor, by regulation, to exempt certain employee welfare benefit plans from the reporting and disclosure requirements of the Act. 29 U.S.C. § 1024(a)(3). Pursuant to this authority, the Secretary has promulgated a regulation which applies directly to plans such as the CBS Plan. 29 C.F.R. § 2520.104-24 specifically exempts from the reporting and disclosure requirements employee welfare benefit plans which are maintained by the employer primarily for the purpose of providing benefits to a select group of management and for which benefits are provided exclusively through insurance policies, the premiums for which are paid directly from the employer's general assets. The CBS Plan fits squarely within this exemption. The fact that the CBS Plan is exempted from this part of ERISA necessarily implies that it is otherwise included within the Act's coverage.
This regulation, along with others, also seems to equate "unfunded" with payment of benefits from the employer's general assets. See also, for example, 29 C.F.R. § 2520.104-20. This correlation is entirely reasonable. In the case of the CBS Plan, for example, the benefits will eventually be paid through the insurance contracts purchased and maintained by payments by Falstaff. Through these payments Falstaff has allowed the insurance companies to accumulate a fund for the eventual payment of benefits. This Court must conclude, therefore, that the CBS Plan is not an unfunded excess benefit plan exempt from ERISA.
Lastly, defendants argue that ERISA does not apply to "key man" plans such as the CBS Plan. There is no support in the *1196 statute for this conclusion. Though unfunded key man plans are excluded from various parts of the Act, 29 U.S.C. §§ 1051(2), 1081(a)(3), and 1101(a)(1), there is no exclusion from ERISA in general for such plans. In any event, the CBS Plan is not unfunded.
Plaintiffs seek declaratory and injunctive relief with respect to the CBS Plan. Section 502 of ERISA permits a participant in a covered plan to bring a civil suit to clarify his rights to future benefits in the plan and to enjoin any act which violates the terms of ERISA or the plan. 29 U.S.C. § 1132(a)(1)(B) and (a)(3)(A). Plaintiffs have clearly shown that the CBS Plan is covered by ERISA and that it is binding and enforceable. They have also shown that they were not discharged due to failure to perform assigned duties with reasonable skill and diligence, gross misconduct, or conviction of a felony. Furthermore, defendants have indicated a desire and intent to terminate the Plan unless enjoined from doing so. Appropriate declaratory and injunctive relief to prevent termination of the Plan and to keep the Plan in full force and effect will therefore be granted. Both Falstaff and Kalmanovitz are fiduciaries with respect to the CBS Plan, 29 U.S.C. § 1002(21), and the declaratory and injunctive relief will therefore be directed toward each of them.
Plaintiffs also seek various other forms of injunctive relief. As to the majority of these requests, this Court believes that such relief is not appropriate. The relief which will be granted will fully protect plaintiffs' interests in the Plan, thereby rendering portions of the relief requested unnecessary. As to other portions, plaintiffs have failed to prove the alleged violations of ERISA, or have failed to show the necessity of injunctive relief.
Plaintiffs have shown, however, that defendants have borrowed money from the CBS Plan in the past, and, unless enjoined, are likely to do so in the future. Such borrowings violate the fiduciary responsibilities of ERISA. Section 406 prohibits the lending of money between a plan and a party in interest. 29 U.S.C. § 1106(a)(1)(B). Defendants are clearly parties in interest. 29 U.S.C. § 1002(14). Such borrowings will therefore be enjoined.

THE SEVERANCE POLICY
This Court has previously ruled that the Severance Policy is an employee welfare benefit plan within the coverage of ERISA, 478 F.Supp. 357, and, despite defendants' continued arguments to the contrary, that conclusion will not be changed. Section 3 of ERISA specifically includes within the coverage of ERISA plans which provide the benefits described in 29 U.S.C. § 186(c). 29 U.S.C. § 1002(1)(B). That section, in turn, specifies severance pay as one of the enumerated benefits. See, also, 29 C.F.R. 2510.3-1(a)(3). Furthermore, in Donnelly v. Aetna Life Ins. Co., 465 F.Supp. 696 (E.D. Pa.1979), a severance pay plan set out in the employer's Personnel Policy Manual, similar to that involved in this case, was held to be an employee welfare benefit plan within the coverage of ERISA. The Falstaff Severance Policy is clearly covered by ERISA.
Plaintiffs Dependahl and Healy seek to recover, pursuant to 29 U.S.C. § 1132(a)(1) (B), the nineteen thousand seven hundred fifty dollars ($19,750.00) still owing under the Severance Policy. This amount represents the twenty-two weeks' pay withheld by defendant Falstaff. Plaintiffs Dependahl and Healy are clearly each entitled to this amount according to the terms of the Severance Policy in effect at the time of their discharge, and judgment will accordingly be entered. They were discharged due to a change in management and personnel, not because of any "cause" which would discharge Falstaff's liability under the Policy.
A different situation is presented, however, with respect to plaintiff Calhoun. Prior to his discharge, Falstaff's Severance Policy was changed. At the time of his discharge, the Policy provided that employees terminated prior to fifteen years employment with Falstaff were not entitled to severance pay. This change was made, however, in contemplation of the mass firings eventually carried out by Falstaff.
*1197 Such a change in the Policy is a clear violation of Falstaff's responsibility to discharge its duty as fiduciary in the sole interest of beneficiaries and for the exclusive purpose of providing benefits to beneficiaries and defraying reasonable expenses. 29 U.S.C. § 1104(a)(1); 478 F.Supp. at 360-361. Falstaff's alteration of the Policy was for Falstaff's benefit alone. Such a change will not be permitted to divest plaintiff Calhoun of his otherwise entitled benefits.
This decision does not mean that an employer may never cut back on benefits previously provided to employees. This Court merely holds that such a change is not permissible when made expressly in contemplation of actions which would otherwise entitle employees to the previously provided benefits.
Plaintiff Calhoun will therefore be awarded the amount he would have received were it not for the change in the Policy. That amount is nine weeks' pay, or five thousand five hundred thirty-four dollars ($5,534.00).[2] As with plaintiffs Dependahl and Healy, Calhoun was not discharged for any reason which would justify Falstaff's withholding of severance pay.
Plaintiffs are also entitled to pre-judgment interest on these amounts. The Severance Policy was a contract to pay a fixed amount of money at a certain date, the breach of which entitles plaintiffs to recovery of the principal amount, plus interest from the date of the breach. Royal Indemnity Co. v. United States, 313 U.S. 289, 61 S.Ct. 995, 85 L.Ed. 1361 (1941); Sebree v. Rosen, 374 S.W.2d 132 (Mo.1964); § 408.020 R.S.Mo. (1979). As to plaintiff Calhoun, the interest shall run from August 8, 1975, the date of his dismissal and denial of benefits. As to plaintiffs Dependahl and Healy, the interest shall run from June 4, 1975, the date on which Kalmanovitz and Falstaff informed these plaintiffs that the payments were terminated. A rate of nine percent (9%) will be allowed. § 408.020 R.S.Mo. (1979).

OTHER CLAIMS
A. Plaintiff Calhoun seeks extensive declaratory and injunctive relief, with respect to the Pension Plan, as well as damages for defendants' action with respect to the Plan. Calhoun claims that he was discharged solely to prevent the vesting of his pension benefits. Were that so, the relief requested might well be appropriate. 478 F.Supp. at 359-360. Section 510 of ERISA prohibits the discharge of any employee to prevent the attainment of any rights to which the employee may become entitled. 29 U.S.C. § 1140.
In order to sustain his cause of action, however, Calhoun must carry the burden of proving that he was discharged to prevent the vesting of his pension benefits. Moore v. Home Ins. Co., 601 F.2d 1072 (9th Cir. 1979). He has failed to do so. Judgment will be entered for defendants on Counts VI, VII, and VIII of Calhoun's complaint.
B. Plaintiffs Dependahl and Healy also seek damages for defendants' alleged violation of Section 510 of ERISA. As to the majority of the relief requested, plaintiffs' prevailing as to the Severance Policy and CBS Plan eliminates any damage. In any event, this Court does not believe that defendants have violated Section 510 with respect to plaintiffs Dependahl and Healy.
It is true that defendants have refused to pay benefits to which these plaintiffs are entitled, and have refused to recognize the validity of the CBS Plan. Plaintiffs' appropriate course of action for such refusals lies in Section 502 of ERISA, which allows them to sue to enforce the plans or the Act, to recover benefits which are owing, or to obtain a declaration as to their rights in the plans. 29 U.S.C. § 1132.
Section 510 of ERISA is directed to an entirely different problem. That section *1198 prohibits actions taken against a plan participant or beneficiary in retaliation for that person's exercising any rights under the Act or the plan, or to interfere with the attainment of any rights to which the person may become entitled. There is no evidence that defendants have taken any such actions with respect to plaintiffs. Defendants have refused to pay benefits to which plaintiffs are entitled; they have not interfered with the attainment of any rights or retaliated against plaintiffs due to their exercise of any rights. Judgment will therefore be entered for defendants on Count IV of plaintiffs Dependahl's and Healy's complaint.
C. Plaintiffs seek substantial actual and punitive damages from Kalmanovitz for his alleged tortious interference with their contractual relations with Falstaff. Plaintiffs allege that Kalmanovitz is liable under this theory due to his obstruction of Falstaff's relations with plaintiffs with respect to the plans at issue in this case.
The elements of such a cause of action are well settled in Missouri. In order to prevail, plaintiffs must prove five elements:
(1) A contract or valid business relationship or expectancy (not necessarily a contract);
(2) Defendant's knowledge of the contract or relationship;
(3) Intentional interference by the defendant inducing or causing a breach of the contract or relationship;
(4) The absence of justification; and
(5) Damages resulting from defendant's conduct.
Salomon v. Crown Life Ins. Co., 536 F.2d 1233, 1238 (8th Cir.) cert. denied, 429 U.S. 961, 97 S.Ct. 387, 50 L.Ed.2d 329 (1976); Francis Chevrolet Co. v. General Motors Corp., 602 F.2d 227, 230 (8th Cir. 1979). It is clear that all the above elements are met in this case. This Court has found that the Severance Policy and CBS Plan were valid and enforceable contracts between plaintiffs and Falstaff. Kalmanovitz obviously knew of these contracts. The refusal of Falstaff to honor them was at the express direction of Kalmanovitz. This Court has found that Kalmanovitz had no justification for directing Falstaff to breach the contract. Lastly, it is clear that plaintiffs lost benefits to which they were entitled due to Kalmanovitz's actions.
Kalmanovitz, however, was acting at all times in his capacity as controlling shareholder of Falstaff. As such, he was privileged to induce a breach of the contracts in question, "provided that no improper means are used, the defendant acts in good faith to protect the corporation and does not act for his own personal benefit". Nola v. Merrollis Chevrolet Kansas City, Inc., 537 S.W.2d 627, 634 (Mo.App.1976). This Court can not conclude that Kalmanovitz was acting in good faith. His actions were taken maliciously and unjustifiably. Throughout this litigation, Kalmanovitz has shown nothing but contempt for the welfare and rights of plaintiffs, as well as for the normal rules of procedure and ethics in this Court. See Order of December 10, 1979. 84 F.R.D. 416. After living with these cases for over four years, this Court is left with the definite and firm conviction that Kalmanovitz enjoys the hardships he has forced upon plaintiffs. Due to this lack of good faith, Kalmanovitz forfeits his privilege to induce Falstaff to breach the contracts in question.
Plaintiffs have clearly been damaged due to the loss of the benefits to which they were entitled. Through this Court's decision on other counts of these cases, however, plaintiffs' actual damages have been eliminated. Kalmanovitz's bad faith and malicious intent justify the imposition of substantial punitive damages in these actions. Judgment will be entered in the amount of fifty thousand dollars ($50,000.00) for each plaintiff against Kalmanovitz as punitive damages on Count IX of Calhoun's complaint and Count V of Dependahl's and Healy's complaint.
D. Plaintiffs Dependahl and Healy seek substantial actual and punitive damages for Kalmanovitz's alleged fraudulent misrepresentations during the negotiations leading up to his purchase of controlling interest in *1199 Falstaff. This claim arises from Kalmanovitz's alleged misrepresentations as to his intent to retain Dependahl and Healy after the takeover. This Court has found that no such representations were made. Judgment will therefore be entered for Kalmanovitz on Count VI of Dependahl's and Healy's complaint.
E. Finally, consideration of plaintiffs' request for attorneys' fees will be deferred until after an appropriate hearing. As prevailing parties, they are entitled to fees pursuant to Section 502(g) of ERISA. 29 U.S.C. § 1132(g). The calculation of attorneys' fees in this action will be more complicated than usual due to the inter-relationship of this case with others brought by similarly situated individuals, the complicated nature of this suit, and the complex proceedings it engendered. It is clear, however, that many hours of legal work were required of plaintiffs' attorneys because of defendants' uncooperativeness and recalcitrance. This aspect of these proceedings will, of course, be fully considered when attorneys' fees are awarded herein.
NOTES
[1] This court must concede, however, that it is with some reluctance that it concludes that defendants are entitled to any measure of equity in light of their conduct throughout this litigation.
[2] Plaintiff Calhoun seeks essentially this same relief in Count IV of his complaint, under the theory that defendants breached their fiduciary duty with respect to the Policy. As judgment will be entered in plaintiff Calhoun's favor on Count III of his complaint, Count IV is superfluous and judgment will be entered in defendants' favor on that count.