John P. BIGGER, Harold H. Clokey, Barbara J. Wackly, Robert F. Wiegel, Individually and on behalf of similarly situated participants of the American Carriers Pension Plan and the American Commercial Lines Pension Plan, Plaintiffs,

v.

AMERICAN COMMERCIAL LINES, INC., a Delaware Corporation, Meidinger, Inc., a Kentucky Corporation, First Kentucky Trust Company, a Kentucky Corporation, Texas Gas Transmission Corporation, a Delaware Corporation, American Commercial Lines Pension Plan, an employee benefit plan, Defendants.

No. 83–1310–CV–W–8.

United States District Court, W.D. Missouri, W.D.

Jan. 25, 1988.

Robert M. Kroenert, Morrison, Hecker, Curtis, Kuder & Parrish, Kansas City, Mo., Hal N. Bogard, Brown, Todd & Heyburn, Louisville, Ky., for American Commercial Lines, Inc.

Dennis D. Palmer, Shughart, Thomson & Kilroy, Kansas City, Mo., for Meidinger, Inc.

J. Scott Merritt, Jr., Stinson, Mag & Fizzell, Kansas City, Mo., Gary D. Garrison, Ivan J. Schell, Ewen, MacKenzie & Peden, P.S.C., Louisville, Ky., for First Kentucky Trust Co.

David W. Shinn, Shook, Hardy & Bacon, Kansas City, Mo., Peter J. Nickles, John H. Schafer, Covington & Burling, Washington, D.C., for Texas Gas Transmission Corp.

Edward A. Scallet, Thompson & Mitchell, Washington, D.C., for American Commercial Lines, Inc. Pension Plan.

## MEMORANDUM OPINION AND JUDGMENT

STEVENS, District Judge.

This matter was tried to the court and thereafter the parties submitted post-trial briefs. Having heard and examined the evidence and having considered the parties' briefs, the court today enters its findings of fact and conclusions of law, Fed.R.Civ.P. 52(a).[1]

### I. *Findings of Fact*

1. At all times relevant to this lawsuit, American Carriers, Inc. (ACI) was a wholly-owned subsidiary of American Commercial Lines, Inc. (ACL).

2. At all times relevant to this lawsuit, ACL was a wholly-owned subsidiary of Texas Gas Transmission Corporation (TG).

3. Prior to January 1, 1981, the employees of ACI were participants in the American Commercial Lines, Inc. Pension Plan (ACL Plan).

4. During 1979 and 1980, ACI experienced financial difficulty and sought to reduce its pension expenses. In 1980, ACI asked ACL and TG to consider methods by

Kent E. Whittaker, Terrence Ahern, Hillix, Brewer, Hoffhaus & Whittaker, Kansas City, Mo., for plaintiffs.

---

1. A prior opinion of this court may be found at 652 F.Supp. 123 (W.D.Mo.1986).

which ACI could eliminate, suspend, or reduce its contributions to the ACL Plan.

5. During the summer of 1980, TG decided to spin-off [2] the ACI employees participating in the ACL Plan from that Plan into a new, separate pension plan with lower benefits. The new spun-off plan covering ACI employees became known as the American Carriers, Inc. Pension Plan (ACI Plan).

6. The spin-off of the ACI participants from the ACL Plan into the new ACI Plan was effective January 1, 1981. 26 C.F.R. § 1.414(l)–1(b)(11).

7. Meidinger, Inc. (Meidinger) provided the actuarial functions required to effect the spin-off. It calculated on a termination basis the present value of the pension benefits the ACI employees had accrued during their participation in the ACL Plan as of January 1, 1981.

8. First Kentucky Trust Company (First Kentucky) at all times relevant to this lawsuit held the assets of the ACL Plan in trust. It calculated the total value of the ACL Plan's assets as of January 1, 1981. First Kentucky held the assets of the new ACI Plan in trust until October 1, 1983, when plaintiff Centerre Bank of Kansas City, N.A., became trustee of the ACI Plan.

9. As of December 31, 1980 the fair market value of the ACL Plan exceeded by $7,630,104 what Meidinger calculated to be the present value of accrued benefits of all employees covered by the ACL Plan, figured on a termination basis.

10. When it executed the spin-off at issue in this lawsuit, TG did not allocate to the new ACI Plan any of this $7,630,104 surplus.

11. On January 1, 1981, the effective date of the spin-off, TG allocated to the ACI Plan the amount Meidinger calculated to be the present value of the accrued benefits of ACI employees figured on a termination basis. Meidinger calculated this amount to be $8,555,826.

12. Assets were not actually transferred to the ACI Plan's separate account at First Kentucky until July 13, 1982. At this time, $7,746,904.14 was transferred to the ACI Plan.

13. ACL at all times relevant to this lawsuit was the sponsoring employer (plan sponsor) of the ACL Plan.

14. The ACL Plan at all times relevant to this lawsuit was a single plan, 26 C.F.R. § 1.414(l)–1(b)(1), funded by employer contributions.

15. The ACL Plan at all times relevant to this lawsuit was a defined benefit plan. 29 U.S.C. § 1002(35).

16. The plaintiff class consists of those participants and beneficiaries of the ACL Plan who were spun-off from the ACL Plan into the new ACI Plan on January 1, 1981.

## II. *Discussion*

### A

In order for the court to find in favor of plaintiffs on Counts I, II, or III of the operative complaint, it must first find merit in the basic theory upon which they have prosecuted this case. As plaintiffs themselves put it:

> The main basis for defendants' liability may be simply stated. If the defendants could have transferred more plan assets from the ACL Plan to the ACI Plan, as they admit, then the amount to be transferred is the subject of a fiduciary decision, and, the decision cannot be made to serve any purpose other than the interests of the participants. The defendants admit that the decision was made on the basis of other criteria, the economic interest of the sponsoring employer. They are therefore liable.

Plaintiffs' Post–Trial Brief 1.[3] Indeed, the trial of the case and the post-trial briefing have cast plaintiffs' position in sharp relief. Plaintiffs maintain that whenever a surplus exists in a single plan after some subset of the class of all employees covered by that

2. This term is defined at 26 C.F.R. § 1.414(l)–1(b)(4).

3. Plaintiffs do not claim that the ACL Plan document itself (Exhibit 1) gives them a right to some portion of the surplus. "Plaintiffs have never claimed that class members have a proprietary interest in any plan assets." Plaintiffs' Reply Post–Trial Brief 22.

plan are spun-off into a new and separate plan, the failure of the sponsoring employer to transfer a portion of the surplus to the spun-off plan *ipso facto* establishes a violation of the fiduciary duty provisions of the Employee Retirement Income Security Act (ERISA), 29 U.S.C. §§ 1001 *et seq.* Plaintiffs maintain that they are entitled to a portion of the surplus in this case solely by dint of the fiduciary duty provisions of ERISA. The court disagrees.

There is no case law in support of plaintiffs' theory. Plaintiffs have directed the court's attention to a number of cases which adopt the proposition that, in the context of the management of an ongoing plan, those persons falling within ERISA's definition of a fiduciary must discharge their duties solely in the interest of the plan's participants and beneficiaries. *See, e.g., Leigh v. Engle,* 727 F.2d 113 (7th Cir.1984); *Donovan v. Bierwirth,* 680 F.2d 263 (2d Cir.1982), *cert. denied,* 459 U.S. 1069, 103 S.Ct. 488, 74 L.Ed.2d 631 (1982); *Dependahl v. Falstaff Brewing Corp.,* 491 F.Supp. 1188 (E.D.Mo.1980), *rev'd on other grounds,* 653 F.2d 1208 (8th Cir.), *cert. denied,* 454 U.S. 968, 102 S.Ct. 512, 70 L.Ed.2d 384 (1981). These cases, however, simply do not establish principles particularly helpful to the decision of the case at bar. None of the cases cited by plaintiffs in their briefs in support of their legal theory explicitly or even implicitly holds that a sponsoring employer who determines to execute a spin-off transaction such as the one in this case must—by sheer force of ERISA's fiduciary duty provisions (and at peril of violating those provisions)—

transfer to the spun-off plan some portion of the existing plan's surplus.

In the court's opinion ERISA does not support plaintiffs' theory, and in fact several reported decisions directly undercut their position.

Turning first to the language of the statute itself, plaintiffs regard 29 U.S.C. § 1104(a)(1)(A)(i) as their legal basis for recovery, so far as Counts I, II, and III are concerned.[4] Though plaintiffs speak in terms of a "duty of loyalty" as distinguished from a "duty of impartiality" in their briefing, the court prefers to analyze the case by reference to the words of the statute upon which plaintiffs rest their claims. The "fiduciary duties" section of ERISA provides, in pertinent part:

(1) Subject to sections 1103(c) and (d), 1342, and 1344 ... a fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and—

(A) for the exclusive purpose of:

(i) providing benefits to participants and their beneficiaries;

29 U.S.C. § 1104(a)(1)(A)(i).[5]

In the court's opinion, it is evident from the just-quoted language that plaintiffs' theory, as they themselves describe it, is problematic on the face of the very provision of ERISA upon which they rely. Congress wrote the fiduciary duty described in section 1104(a)(1)(A)(i)—and all of the fiduciary duties listed in section 1104(a), for that matter—as expressly "[s]ubject to section[ ] ... 1344." Section 1344[6] governs

---

**4.** In Count I of their second amended complaint, plaintiffs allege 29 U.S.C. § 1104(a)(1) and 29 U.S.C. § 1106(b)(1) as their statutory bases for recovery under that count. Second Amended Complaint ¶¶ 30, 31. Plaintiffs did not present evidence nor do they argue in their briefs that any defendant violated section 1106(b)(1) in any manner factually or conceptually distinct from the alleged failure to execute the spin-off at bar solely in the interest of the participants and beneficiaries of the ACI Plan. Thus, the precise text upon which plaintiffs have pursued this count is 29 U.S.C. § 1104(a)(1)(A)(i). Count II alleges liability against defendants Meidinger and First Kentucky under 29 U.S.C. § 1105(a). Second Amended Complaint ¶¶ 42–47. As pled, this

count is premised on the theory that either ACL, Meidinger, or First Kentucky violated section 1104(a)(1) in the same manner just mentioned with respect to Count I. Count III alleges that Meidinger conspired with ACL and TG in their breach of section 1104(a)(1). Thus, Counts I, II, and III each turns on the legal viability of plaintiffs' sole, basic claim that the spin-off transaction at bar violated section 1104(a)(1)(A)(i).

**5.** In this opinion the court assumes, but does not decide, that each defendant is a fiduciary within the meaning of 29 U.S.C. § 1002(21)(A) with respect to the spin-off transaction at bar.

**6.** This provision, 29 U.S.C. § 1344, is referred to in the briefs and was referred to at trial by

the allocation of the assets of a single-employer defined benefit plan upon termination of the plan. Section 1344(d) envisions distribution to the sponsoring employer of any residual assets (surplus) provided, among other things, that all the liabilities of the plan to participants and their beneficiaries have been satisfied. The court will return to this point *infra* at 632, but for now it is sufficient to observe that in a termination scenario governed by section 1344, section 1104(a)(1) itself permits the sponsoring employer to garner the sole benefit of surplus assets.

Again focusing on the statutory language quoted above, section 1104(a)(1)(A)(i) requires a fiduciary to discharge his "duties with respect to a plan solely in the interest of the participants" and requires a fiduciary to discharge these duties "for the exclusive purpose of providing benefits to participants." It makes sense, then, to ask what, specifically, is a plan sponsor's "duty with respect to a plan" when the plan is undergoing a spin-off transformation, to ask what, specifically, is the "interest of the participants" who are being spun-off, and to ask what, specifically, are the "benefits" the employer must "provid[e] ... to" those spun-off "participants." The court finds the answer to this set of questions in another provision of ERISA:

> A pension plan may not ... transfer its assets or liabilities to[ ] any other plan ... unless each participant in the plan would (if the plan then terminated) receive a benefit immediately after the ... transfer which is equal to or greater than the benefit he would have been entitled to receive immediately before the ... transfer (if the plan had then terminated).

29 U.S.C. § 1058;[7] *see also* 26 C.F.R. § 1.414(l)–1(n)(1) (section 1058 satisfied if value of assets allocated to spun-off plan is not less than present value of benefits of spun-off participants on a termination basis

before the spin-off). This statutory and accompanying regulatory language defines the duty of the sponsoring employer and the interest of the participants who are to be covered by a new, separate plan pursuant to a spin-off transfer. Each spun-off participant has an interest (that is, a legal claim or entitlement) to his or her accrued benefits, and the sponsoring employer has a concomitant duty to transfer to the new spun-off plan assets sufficient to fund these benefits, where these benefits are calculated on a termination basis. So long as the new plan is funded in accordance with this termination-basis standard, it is the court's view that the sponsoring employer (ACL) has provided the participants in the new spun-off plan (employees of ACI covered by the new ACI Plan) their full interest and the full measure of benefits to which they are entitled under ERISA.

The court finds support for this conclusion in the case law. Once accrued benefits are fully funded in the new spun-off plan, it is the court's view that further employer decision-making with respect to how to allocate surplus is a business decision which does not further implicate fiduciary duties and is not further regulated by ERISA. *See Dhayer v. Weirton Steel Division of National Steel Corp.,* 571 F.Supp. 316, 328–29 (N.D.W.Va.1983), *aff'd sub nom. Sutton v. Weirton Steel Division of National Steel Corp.,* 724 F.2d 406 (4th Cir.1983), *cert. denied,* 467 U.S. 1205, 104 S.Ct. 2387, 81 L.Ed.2d 345 (1984) (employer negotiations not affecting protected benefits do not implicate ERISA's fiduciary duties); *Hickerson v. Velsicol Chemical Corp.,* 778 F.2d 365, 374 (7th Cir.1985), *cert. denied,* —— U.S. ——, 107 S.Ct. 70, 93 L.Ed.2d 28 (1986) (ERISA's fiduciary principles protect only employees' claims to accrued benefits, the value of which is determined by section 1058). Allocation of some portion of the surplus to the ACI Plan, that is, funding the ACI Plan above and beyond

counsel and witnesses as "section 4044," its original designation within ERISA. The court will refer to it as "section 1344."

**7.** There is a parallel provision in the Internal Revenue Code, 26 U.S.C. § 414(*l*). This provi-

sion is referred to in the briefs and was referred to at trial by counsel and witnesses as "section 414(l)." The court will refer to it as "section 1058."

the level required by section 1058, would have the principal effect of reducing the contributions ACI (the corporation) will have to make to the ACI Plan in future years. Section 1104(a)(1)(A)(i) does not require ACL to bestow such a benefit upon ACI nor does it prevent ACL from giving itself an economic preference over its wholly-owned subsidiary. *See, e.g., Amato v. Western Union International, Inc.,* 773 F.2d 1402, 1414, 1416–17 (2d Cir.1985), *cert. dismissed,* 474 U.S. 1113, 106 S.Ct. 1167, 89 L.Ed.2d 288 (1986) (so long as employer funds plan at a level sufficient to cover accrued benefits, district court's dismissal of claim brought under section 1104(a) is proper).

Second, the only reported case dealing squarely with a plan spin-off scenario supports the court's reading of ERISA. In *Foster Medical Corporation Employees' Pension Plan v. Healthco, Inc.,* 753 F.2d 194 (1st Cir.1985), Healthco, Inc. sold its Medical Division to Foster Medical Distribution Corporation and transferred from the Healthco Plan to the Foster Plan assets sufficient to fund the accrued benefits of Medical Division employees. The Healthco Plan contained a surplus, and Healthco, Inc. did not transfer any of it to the Foster Plan when it spun-off its Medical Division employees. The Foster Plan claimed it was entitled to a pro-rata share of the surplus, arguing that section 1104(a) prohibited Healthco, Inc. from preferring the employees who remained under the coverage of the Healthco Plan over those employees who were to be spun-off into the Foster Plan. The *Foster Medical* court wrote:

[H]aving been fixed, the pension benefits of Medical Division employees are not subject to increase, even should plaintiffs recover a pro rata share of the Healthco

Plan's surplus. *As long as the Foster Plan is fully funded,* the employees are fully protected and will receive their defined benefits. Similarly, employees remaining under coverage of the Healthco Plan will enjoy no increase in their defined benefits by virtue of the surplus. In short, neither group of employees is preferred over the other and hence defendants have breached no fiduciary duty.

*Foster Medical Corporation Employees' Pension Plan,* 753 F.2d at 199 (emphasis added).[8] The *Foster Medical* opinion supports this court's view that the concept of full funding delimits the question of fiduciary duty in a spin-off transfer situation such as the one at bar. *See also United States v. Western Electric Co.,* 569 F.Supp. 1057, 1095 & n. 166 (D.D.C.), *aff'd mem. sub nom. New York State Dep't of Public Service v. United States,* 464 U.S. 1013, 104 S.Ct. 542, 78 L.Ed.2d 719 (1983) (suggesting that ERISA does not require excess assets to follow spun-off employees because there is no requirement under ERISA that those employees must receive the benefit of excess assets). *Foster Medical* supports the court's view that TG and ACL did not, in keeping all of the surplus within the ACL Plan, prefer ACL employees over ACI employees; to use plaintiffs' terminology, TG and ACL did not breach their "duty of impartiality." *Dhayer, Hickerson,* and *Amato* support the court's view that, assuming ACL funded the ACI Plan in accordance with section 1058,[9] TG and ACL did not fail to discharge their duties solely in the interest of the plan participants in deciding to keep all of the surplus within the ACL Plan; to use plaintiff's terminology, TG and ACL did not breach their "duty of loyalty."[10]

---

**8.** Although the *Foster Medical* court did not explicitly consider section 1058 in its opinion, its concept of full funding was drawn from plan language which tracked the language of that section and the regulation cited *supra* at 630. *See* 753 F.2d at 196.

**9.** This assumption is explored *infra,* section II–B.

**10.** While plaintiffs also suggest that the common law of trusts supports their position (*see*

Plaintiffs' Post–Trial Brief at 2, 19, 26; Plaintiffs' Reply Post–Trial Brief at 13, 21, 23), plaintiffs refer the court to only the most general of trust principles. Upon further inquiry, it becomes problematic whether the common law of trusts supports plaintiffs' position. *See* G. Bogert, The Law of Trusts and Trustees § 469 (1977); Restatement (Second) of Trusts § 430 (1959); 5 A. Scott, The Law of Trusts §§ 430–430.4 (1967).

Section 1058's concept of benefits on a termination basis is defined by regulation to mean the benefits that would be provided by the plan assets pursuant to section 1344 if the plan then terminated. 26 C.F.R. §§ 1.414(l)–1(b)(5)(i), –1(b)(5)(ii). The court heard no evidence at trial which would support a finding that Meidinger misapplied these regulations or misapplied section 1344 in determining that section 1058 required TG and ACL to allocate $8,555,826 to the new ACI Plan on January 1, 1981. Although ACL did not actually terminate the ACI Plan, had it chosen to so do it could have transferred the entire surplus to the new plan, terminated it in accordance with section 1344, and recaptured the entire surplus for benefit of its own corporate treasury. *See Washington–Baltimore Newspaper Guild Local 35 v. Washington Star Co.*, 555 F.Supp. 257 (D.D.C.1983), *aff'd mem.*, 729 F.2d 863 (D.C.Cir.1984); *In Re Moyer Co. Trust Fund*, 441 F.Supp. 1128 (E.D.Pa.1977), *aff'd mem.*, 582 F.2d 1273 (3d Cir.1978); III Tr. 10–12 (testimony of Dan McGill); Ex. 189 (Treasury Department guidelines). The fiduciary duty provisions of section 1104(a) would not have prevented ACL from recapturing the surplus in this fashion. *See supra* at 629–30.

In the court's view, it would be anomalous to read ERISA on the one hand to permit ACL to recapture the entire surplus pursuant to a spin-off and termination of the ACI Plan but on the other hand, in the absence of a termination, to require ACL to transfer some portion of the same surplus from the ACL Plan to the ACI Plan even though ACL had already transferred to the ACI Plan everything to which its participants are entitled under section 1344. Plaintiffs have failed to convince the court that ERISA requires such a conclusion.

**B**

■ In the court's view, the only real question in this case is whether the ACI Plan was funded on January 1, 1981 in accordance with section 1058. This is the issue framed by Count IV of the operative complaint.[11] The parties agree that $7,746,904.14 was transferred from the ACL Plan to the ACI Plan in July of 1982. The source of the controversy in Count IV is a Meidinger worksheet, admitted into evidence as Exhibit 44, on which this $7,746,904.14 figure as well as three higher figures—$8,555,826, $8,802,315, and $8,973,993—appear in various columns. Plaintiffs contend that ACL should have transferred to the ACI Plan $8,973,992 and not $7,746,904.14 to meet the funding requirement of section 1058. Plaintiffs failed to carry their burden of proof as to this count at trial.

In the court's view, ACL was not required to transfer $8,973,993 to the ACI Plan in order to be in compliance with section 1058. The evidence established that the $8,973,993 figure represented only what Meidinger expected to be the market value on June 30, 1982 of the assets originally allocated to the ACI Plan on January 1, 1981 (the $8,555,826 figure). Ex. 44; II Tr. 55–56 (testimony of Steve Semaria); Ronald Seeling Deposition 22. This figure was "expected" in the sense that it was based on an assumed annual investment return rate of five percent. II Tr. 55. The ACL Plan did not achieve a five percent rate of return between January 1, 1981 and June 30, 1982; therefore, the projected allocation figure of $8,973,993 turned out to be an inaccurate prediction.

The fact remains, however, that TG and ACL directed Meidinger to transfer $8,555,826 on its books from the ACL Plan to the ACI Plan on January 1, 1981. Plaintiffs do not contend that *this* figure was improper under section 1058. The evidence demonstrated that owing to the mechanics of a spin-off transaction, the actual transfer of funds always occurs some time after the effective date of the spin-off itself. III Tr. 115–117 (testimony of Ira Cohen). There is

---

11. Count IV also alleges an arithmetical error in the calculation of the amount to be transferred. Second Amended Complaint ¶ 57. During the trial of this case, the parties informed the court that they had settled this portion of Count IV.

The court, after notice to the plaintiff class, conducted a hearing on the proposed settlement on May 12, 1987 and entered its order formally approving the settlement on June 1, 1987.

simply no doubt in this record that the $7,746,904.14 ultimately transferred to the ACI Plan in July of 1982 represented the June 30, 1982 value of the same $8,555,826 sum originally allocated to the ACI Plan on January 1, 1981. That the former figure happened to be lower than the latter figure due to adverse market performance in the interval does not make the transfer of the former figure to the ACI Plan a violation of section 1058, because the proper amount was allocated to the ACI Plan on the effective date of the spin-off (January 1, 1981), and ERISA requires no more.

### III. CONCLUSIONS OF LAW

1. This court has jurisdiction over this case pursuant to 29 U.S.C. § 1132(e).

2. To the extent that the fiduciary duty of 29 U.S.C. § 1104(a)(1)(A)(i) applies to the spin-off transaction at issue in this case, defendants have properly discharged that duty.

3. Defendants complied with 29 U.S.C. § 1058 in executing the spin-off transaction at issue in this case.

For the foregoing reasons, then, it is

ORDERED that judgment be entered in favor of defendants and against plaintiffs on Counts I, II, III, and IV of Plaintiffs' Second Amended Complaint. It is further

ORDERED that defendants' November 24, 1986 joint motion for summary judgment is denied as moot. It is further

ORDERED that defendant Meidinger, Inc.'s cross-claim against defendant American Commercial Lines, Inc. Pension Plan is dismissed as moot. It is further

ORDERED that plaintiffs' December 30, 1987 motion for joinder, pursuant to Fed.R. Civ.P. 25(c), of The Northern Trust Company as an additional party defendant is denied as moot.