**KOCH INDUSTRIES, INC., Plaintiff,**

v.

**SUN COMPANY, INC., Suntide Refining Co., Sun Refining and Marketing Co., Sun Pipe Line Co., and Sun Marine Terminals, Inc., Defendants.**

**No. C–85–41.**

United States District Court,
S.D. Texas,
Corpus Christi Division.

July 20, 1988.

Kelley D. Sears and Louis K. Obdyke, IV, Wichita, Kan., Shirley Selz, Corpus Christi, Tex., for plaintiff.

Joseph A. Cohn, Jr., Corpus Christi, Tex., Jon Baughman, Philadelphia, Pa., for defendants.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW—PENSION FUNDING

MILES, Senior District Judge;
Sitting by Designation.

The instant case involves Count I of a three-count complaint, filed by plaintiff Koch Industries (Koch) against the numerous "Sun Company" defendants listed above (defendants are referred to collectively as "Sun"). The complaint arises out of a contract to which Koch and Sun were parties. The subject matter of the contract was Sun's sale of a refinery and related assets to Koch in November of 1981.

The complaint as originally pleaded contained three counts. Before trial, this Court ordered that separate trials be held on count I and count II, which are factually unrelated.[1]

Count I involves the transfer from Sun to Koch of an employee pension plan and related assets. Trial on this count was held over a period of two-and-a-half days;

---

1. Count III is an action on a guaranty executed by defendant Sun Company in connection with the contract; there are no factual issues unique to that count.

trial was to the court, upon the consent of all of the parties. All issues in the case have been fully argued and briefed, and the Court therefore now enters its findings of fact and conclusions of law pursuant to Fed.R.Civ.P. 52(a).

The Court has attempted throughout the opinion to segregate its findings of fact from its conclusions of law. However, to the extent that what appear to be "findings" are found in the Court's conclusions, the "findings" should be regarded according to their substance, rather than their label.

### Findings of Fact

1. Plaintiff Koch is a corporation organized and existing under the laws of Kansas, with its principal place of business in Wichita, Kansas.

2. Defendant Sun Company is the parent company of defendants Suntide Refining Co., Sun Refining and Marketing Co., Sun Pipe Line Co., and Sun Marine Terminals, Inc. Sun Company, Sun Refining and Marketing Co., and Sun Marine Terminals, Inc., all are incorporated in Pennsylvania; the other Sun defendants are incorporated in Delaware. Each of the Sun defendants has its principal place of business in a state other than Kansas.

3. In the early fall of 1981, plaintiff made a bid to purchase a refinery and related assets in Corpus Christi from defendant Sun. The bid led to an understanding, and by October of that year, the parties were discussing the finer points of the transaction in an effort to formulate a written agreement. The actual "Acquisition Agreement" was dated November 10, 1981. On November 13, 1981, the "closing date" under the agreement, plaintiff acquired the Sun property.

4. As a consequence of the change in ownership of the Corpus Christi refinery, more than 500 of Sun's employees at the refinery became employees of Koch. Under the terms of the Acquisition Agreement, Koch agreed that these employees would be covered under its pension plan and would be credited for their years of employment with Sun.

5. In the course of negotiations, Koch and Sun undertook to compare the pension plans that were currently in place at each company. Sun had its independent actuary conduct a quantitative comparison of the two benefit programs, a so-called "ben-val" analysis, in October. The results of that study were forwarded to Koch, and were reviewed by Koch's independent actuary. The study showed that Koch's pension plan provided a lower level of benefits than the Sun plan.

6. The primary objective held by all of the parties, in negotiating this aspect of the transaction, was fairness to the transferred employees. In particular, the negotiators wanted to ensure that the employees would receive pension fund credit for the time they had spent working for Sun. The aim was to avoid a phenomenon known as "damaged benefits," which can occur when a worker changes employers during his work life, and which means that the worker may lose credit because of inconsistencies in the various employers' pension plans. One means of achieving the objective was to have the transferee employer adopt a benefit plan substantially similar to that provided by the transferor.

7. The final terms of the Acquisition Agreement between Sun and Koch provided that, before closing, Sun would adopt a special retirement plan for its former employees (the "Suntide Plan"). The new plan would be adopted by Koch as of the closing date, and thereafter would provide benefits. It also provided that the plan would be funded by Seller (Sun), in an amount stated specifically in the agreement.

The exact language from the acquisition agreement is as follows:

13.6 On or before the Closing Date, Sellers shall adopt the "Retirement Plan for Former Employees of Suntide Refining Company and Certain Affiliates" (the "Suntide Plan"). As of the Closing Date, the Suntide Plan will provide benefits, and shall be funded by Sellers [Sun] from whatever source it chooses, with an amount equal to: (i) the present value of

the Accrued Benefit accrued by the Transferred Employees as of the Closing Date under the Sellers' Retirement Plan, calculated under the actuarial methodologies and assumptions stated in Attachment A hereto; plus (ii) the present value of a cost of living adjustment to the Accrued Benefit set forth in (i) above, equal to 6¾%, compounded annually from the Closing Date to the earlier of the date of death, termination or retirement of the Transferred Employees under the Suntide Plan. Such present value of the cost of living adjustment shall be calculated under the actuarial methodologies and assumptions stated in Attachment A hereto. The funding described herein shall be conditioned upon a favorable determination pursuant to a request undertaken by Buyer [Koch], as described in Section 13.7, from the Internal Revenue Service that the Suntide Plan is qualified under Section 401 of the Code.

Plaintiff's exhibit 40, ¶ 13.6.

8. The Suntide Plan, as adopted by Sun and assumed by Koch, is a "defined benefit" plan. Under such a plan, the participants are guaranteed benefits in a certain amount, based upon their salary when separated from employment, as well as upon years of service. The funds invested in such a plan generally are those that are deemed to be sufficient to meet future obligations of the plan; future obligations are projected based upon a series of actuarial assumptions regarding circumstances in the future, such as interest rates; mortality and morbidity rates; and the like.

According to the agreement reached between Sun and Koch, Koch bears the risks associated with the actuarial assumptions used in the Suntide Plan. Therefore, if assumptions under the plan subsequently are proved incorrect, and the amount invested is not adequate to meet future needs of the fund, the plaintiff will be obligated to satisfy the shortfall.

9. One of the terms incorporated in ¶ 13.6 of the agreement requires Sun to pay a "cost of living adjustment" (COLA) to the benefit of the plan. The COLA, which is set out in subparagraph (ii) of ¶ 13.6 (see supra), was designed to compensate Koch for the fact that the employees' rights to pension benefits will increase as a function of salary increases. The increases in salary were expected to continue during the time that the employees work for Koch. Insofar as pension benefits under the plan are based upon salaries earned during the last years of employment, the overall funding requirements of the plan were expected to increase as the employees continued with Koch. In paying the COLA, Sun assumed this "uplift," or increased burden on the plan, based upon an assumed rate of average salary increases (6¾%).

Sun's representatives testified, based upon their experiences of pension fund asset transfers, that this provision was an unusual one, and highly advantageous to the plaintiff.

10. The Acquisition Agreement became effective on November 10, pursuant to the parties' express agreement.

11. After the agreement was signed and effective, but before closing, a phone conversation took place between the following persons: Tom Carey, the chief financial officer at Koch; William Donohue, Sun's in-house counsel; David Marshall, Sun's manager in charge of employee benefit planning; and Howard Weizman, another member of Sun's legal department. During this conversation, Carey asked whether ¶ 13.6 of the Acquisition Agreement, in its final form as signed, obligated Sun to pay interest on the amount with which it was to fund the Suntide Plan. The response (either from Donohue or from Marshall—the accounts differ) was "no." Carey made no reply to this at that time.

Immediately after this conversation Carey posed the same question to Donald Cordes, who at the time was the general supervisor of Koch's legal department. Cordes disagreed with the position taken by Sun's representatives, and reinforced Carey's own belief that the language of ¶ 13.6, as set forth in the final version of the contract, required Sun to inflate the amount of funds transferred, at a rate of

10%, to reflect the "time value of money" between the closing date and date on which funds eventually would be transferred.

Following this conversation, both Carey and Cordes were aware that Koch's interpretation of ¶ 13.6 differed from that held by Sun. However, the conversation prompted neither of the men to follow up on the matter at that time. Neither Cordes nor Carey raised the point with Sun's representatives, or brought the differing interpretations to Sun's attention.

12. The subject of "interest" came up again during a conversation between Donald Cordes and William Donohue. This conversation took place on the eve of the closing date. Donohue again stated that according to his understanding no interest was due on the principal payment, even though the money would be transferred after the closing date. Cordes expressed his disagreement with this interpretation of the contract.

Cordes immediately consulted John McLamb, who was outside counsel for Sun and had advised defendant throughout the negotiations. According to Cordes' uncontradicted testimony at the trial, Cordes informed McLamb of his understanding as to Sun's obligations, and told McLamb that if defendants persisted in their contrary position, he would seek amendment of the agreement on this point. McLamb did not take issue with Cordes, but suggested that they let the agreement "speak for itself." The matter apparently was put to rest after this exchange.

13. Sun made its first transfer of funds under ¶ 13.6 on March 18, 1982, in the amount of $3,881,707. The second and final installment, in the amount of $5,464,523, was paid on April 14, 1982. The total amount transferred therefore was $9,346,230. Both payments were accepted by Koch.

14. Before the transfers were made, Sun's actuary sent Koch the calculations he had used in reaching the $9,346,230 figure. Koch turned the calculations over to Brian Johnson, Koch's independent actuary, who reviewed them. On March 11, 1982, Johnson informed Glen Shore, Koch's manager of employee and public relations, that the figures were "fine," that they had been computed using the proper assumptions and methods, and that as far as he was concerned, Koch could proceed with the asset transfer. *See* defendant's exhibit L6.

15. On April 23, 1982, Donald Cordes sent a letter to Harry Smith, of Sun, regarding a claimed deficiency in the amounts transferred by Sun to the Suntide plan. Cordes informed Smith that "interest," running from November 13, 1981 at a rate of 10%, was due on both portions of the payment. In two subsequent letters to William Donohue, Cordes again requested that Sun make up this deficiency. On September 24, 1982, Donohue by letter formally denied the request for payment of interest, and stated that Sun's position was that the contract did not require this additional payment. *See* plaintiff's exhibits 55, 56, 57.

16. Plaintiff admits that the $9,346,230 would have properly funded the Suntide plan if the money had been transferred on the closing date.

17. The language contained in ¶ 13.6 of the Acquisition Agreement contains no express provision for the payment of "interest" on amounts transferred under that paragraph.

18. Prior to the signing and effective date of the agreement, the parties during negotiations never specifically discussed the issue of "interest" on funds transferred after the closing date. This was testified to by David Marshall (on videotaped deposition), William Donohue, and Tom Carey.

19. Although the issue of interest on funds transferred after closing was not the topic of specific discussions between the parties, there is evidence that the matter was given strategic consideration by each side. Tom Carey testified concerning a handwritten memo he apparently had written in connection with a phone conversation with David Marshall in late October, 1981. A notation on the memo reads "when to transfer money-closing-if not + interest," with an arrow pointing toward an additional note in the margin, which reads "OK

Dec. 31, '81." *See* plaintiffs' exhibit 147. Plaintiff's representatives testified repeatedly, however, that they did not believe that a specific interest term was necessary, because they were confident that the "as of" language in ¶ 13.6 created an obligation to pay interest (or its equivalent).[2]

There was evidence that the Sun negotiators considered that they had profited from Koch's failure to ask for an interest term. Dean Hasseman, a former attorney at Sun, testified (by deposition) to conversations he had with Howard Weizman and William Donohue at the time of the Koch–Sun negotiations. The two Sun negotiators, according to Hasseman, considered that they had "won one over" on Koch, insofar as Koch had failed to request interest. This certainly supports the conclusion that at the time of the formation of the contract, defendant neither intended to pay interest, nor believed that the language already in the contract obligated it to do so.

20. At the time of execution of the Acquisition Agreement, both parties were aware that Sun would not be in a position to make the transfer of pension fund assets on the closing date. William Donohue testified, without contradiction, that during final negotiations he told Donald Cordes that the funds would be transferred within six to eight months. Koch's actuary, Brian Johnson, testified that in his opinion it would have been unlikely that Sun could even have determined the amount to be transferred prior to closing, because the data on which the actuarial assumptions were to be based was not available before closing. The actual collection of the necessary data was not completed until February of 1982. *See* defendant's exhibits G5, H5.

21. The Acquisition Agreement contains no requirement that Sun fund the plan by a specific date. Further, the parties never agreed to funding by a particular date; they did not, as Tom Carey suggested during his testimony, agree that Sun would make the transfers by December 31. *See supra,* ¶ 19 & n. 2.[3]

22. Sun produced evidence of terms from other deals in which it has been involved, in which pension fund assets were transferred. The contracts that were introduced contained specific terms for transfers of an estimated amount at the time of closing, with reconciliation of the estimates against the true figures at a later time. These agreements contained specific provisions governing the application of interest to amounts transferred. *See* defendant's exhibits W3, X3, Y3, Z3. There was no evidence that plaintiff ever was aware of any of these contracts or their terms; there was no evidence that plaintiff's representatives were aware of any "custom or practice" involving contract provisions governing the application of interest to pension fund asset transfers.

*Conclusions of Law*

The Court has jurisdiction over this case based upon diversity of citizenship, under 28 U.S.C. § 1332.

---

**2.** This cryptic exhibit does not convince the Court that the parties agreed to the accrual of interest, especially because Carey had no independent recollection of specific discussion of the matter. Carey only stated that he believed he and Marshall had agreed on "everything" written on the memo, with the exception of two unrelated points. Marshall had no recollection of having discussed interest at that time.

In any event, a finding that the parties had agreed to the terms written on the Carey memo is not reinforced by the terms of the contract itself, which refers neither to interest nor to payment by 12/31/81. If there had been such an agreement, it would be inconsistent with the argument plaintiff is making in this case, insofar as plaintiff is requesting interest not just from 12/31/81, but from the closing date.

**3.** Marshall testified that early discussions between the parties had involved the date 12/31/81. The parties at one point had considered agreeing that Sun continue to provide pension benefits to the transferred employees, at Koch's expense and option, through that date. According to Marshall, that idea was scratched, prior to final negotiations, because of tax considerations.

The evidence also showed an early set of contract terms, suggested by plaintiff, in which it was specifically stated that funds would be transferred "no later than 12/31/81 from the Sun Retirement Plan to the Koch Industries Employees' Pension Plan." *See* plaintiff's exhibit 146. This language did not become a part of the final agreement, and there is no evidence that the terms were expressly or impliedly agreed to by defendant.

The Acquisition Agreement specifically states that it is a "Texas contract," to be "construed, governed by, and administered in accordance with the laws of the State of Texas." *See* plaintiff's exhibit 40 (Acquisition Agreement) ¶ 21.1. This statement of intention is binding on this Court. *Budge v. Post*, 643 F.2d 372, 374 n. 1 (5th Cir. 1981). Therefore, the substantive law of the state of Texas governs construction of the agreement involved here, as well as the rights of the parties to the agreement.

Each party maintains that the language contained in ¶ 13.6 is clear and unambiguous, and that it supports its respective position. Plaintiff asserts that it is inherent in the words used, particularly the words "fund," "as of," and "present value," that amounts transferred after the closing date were to be adjusted to reflect interest that could have been earned during the interim. Defendant, on the other hand, claims that because the term "interest" appears nowhere in that section of the agreement, there is no requirement that interest be added to defendant's obligation.

The following principles apply to this Court's review of the agreement. In general, if a contract is unambiguous, it must be construed as a matter of law. *Praeger v. Wilson*, 721 S.W.2d 597, 600 (Tex.Ct. App.1986). A contract is not rendered ambiguous, however, merely because the parties disagree over its interpretation. *Id.* The parties are bound by the meanings of the words they have chosen. One of the parties, therefore, cannot unilaterally change the meanings of clear and unambiguous terms, solely upon the strength of his understanding or belief in the words' meanings, unless he was led to such an understanding or belief by the conduct of the other party. *McBride v. Ponder*, 242 S.W. 2d 253 (Tex.Civ.App.1951).

The parol evidence rule excludes extrinsic evidence that is offered to vary or contradict the terms of an integrated contract. *Pennzoil Co. v. Federal Energy Regulatory Comm'n*, 645 F.2d 360, 388 (5th Cir. 1981). By the same token, however, a court in construing a contract primarily is charged with the task of giving effect to the parties' intentions. Therefore, even in an integrated and unambiguous agreement, extrinsic evidence of facts and circumstances that surrounded the making of the agreement may be used to explain and interpret the contract in light of the parties' true intentions. *Id.; Benson v. Jones*, 578 S.W.2d 480, 484 (Tex.Civ.App.1979).

The Acquisition Agreement between Koch and Sun "represents the entire understanding of the parties, and supersedes and replaces all prior agreements, contracts, arrangements, and understandings between [Koch] and [Sun]." Plaintiff's exhibit 40, ¶ 21.3.

The Court further concludes that the language in ¶ 13.6, governing the funding of Koch's pension plan, is not ambiguous with respect to the amount that Sun was obligated to pay. In this regard, the Court is guided by the clear and commonly-recognized meanings of the terms used in that paragraph. The term "present value" is commonly understood as the sum which, if received and invested at a designated time (commonly, the *present*), will yield a certain sum at a point in the future. *See Republic Bankers Life Insurance Co. v. Jaeger*, 551 S.W.2d 30 (Tex.1976); *DuBois v. DuBois*, 335 N.W.2d 503, 506 (Minn. 1983). The term "present value" designates a specific amount of money if the variables by which it is defined are made specific. Therefore, the "present value" of a sum certain, to be received at a particular date in the future, and assumed to be invested at a particular time and at a particular rate, will have only one value. In this case, ¶ 13.6 of the agreement, by its clear language, gives certainty to the term "present value." The amount of payout, the projected time(s) at which amounts will be paid, and the projected interest rate all are contained in the actuarial assumptions incorporated in that paragraph. Further, the time from which the actuarial and interest assumptions run is the "closing date," which is defined in the agreement and has only one meaning.[4] The defendant there-

---

**4.** The phrase "as of," as used in the context of

"as of the Closing Date" in ¶ 13.6, has as plain-

fore is obligated to fund the plan with an amount "equal to" that amount which, if invested at the assumed rate on the closing date, would yield the future benefits, at the prescribed times, according to the set of assumptions given.

The defendant's actuary, applying the methodologies and assumptions contained in the agreement, calculated that the "present value ... as of the closing date" was $9,346,230. The plaintiff's actuary approved that figure, and plaintiff has agreed that transfer of that amount would have constituted compliance with the contract, *if* transfer had taken place on the closing date. The essence of plaintiff's position in this case, however, is that the language used in ¶ 13.6 requires that payments made after the closing date be increased to reflect what plaintiff calls the "time value of money."

The plaintiff relies upon the use of the word "funded" in the second sentence of ¶ 13.6. It suggests, in effect, that Sun's obligation to "fund" the plan required Sun to transfer an amount sufficient to provide the accrued benefits, at specific dates in the future, if all the actuarial assumptions (including the projected interest rate) prove to be accurate.

Plaintiff's emphasis on the word "fund" ignores the fact that the rest of the language in that sentence, as demonstrated above, states clearly that Sun is to fund the plan in a specific amount. That amount is not defined with reference to when the amount is paid. Further, it is not defined solely with reference to the amount that is to be paid out in the future, as plaintiff contends; rather, the amount is defined in terms of future benefits, discounted to present value *as of a specific date.* [5]

The amount that plaintiff claims should have been paid by Sun is in reality the present value of future benefits as of the *transfer* date, rather than as of the closing date. This is apparent from the fact that plaintiff requests that a 10% interest rate be applied to the amount that Sun paid. The 10% rate is the discount rate that was agreed to under the contract. As plaintiff's actuary admitted in his testimony, application of this 10% rate, over the time between closing and transfer, would have exactly the same effect as if the future benefits were discounted to the transfer date. Plaintiff therefore is asking the Court to substitute the term "transfer date" for "closing date."

The plaintiff's argument seems especially incongruous when one notes that at the time of contracting both parties knew that the funds would not be transferred until after the closing date. If plaintiff's interpretation is correct, the parties provided specifically for payment of present value as of the closing date, even though they knew that, because transfer would not occur on or by the closing date, that amount would not satisfy the contract. The plaintiff's argument therefore would render meaningless the very language that was selected by the parties. Contract interpretations that render the language in the writing meaningless are generally held to be unreasonable, and therefore are universally disfavored. *See Praeger v. Wilson,* 721 S.W.2d 597, 601 (1986).

If the contract specifically had provided that transfer must be made by a certain date, plaintiff would have a valid basis for insisting on the addition of interest. As the Court already has found, however, the contract does not so provide; further, the

tiff suggests been construed to mean "as if it were." *See United States v. Munro–Van Helms Co.,* 243 F.2d 10, 13 (5th Cir.1957). This meaning fits perfectly with the term "present value," with the result that the value of the future benefits, under the assumptions given, is assessed as though the funds were received on the closing date.

**5.** Both parties introduced in evidence several proposed drafts of the agreement. In one early

draft, ¶ 13.6 stated that funds would be transferred from Sun's plan to Koch's "sufficient to provide all benefits accrued for transferred employees as of closing." *See* defendant's exhibit M4. The language quoted did not make it to the final version of ¶ 13.6. The Court finds that the language makes an interesting contrast, however, with the language that does comprise the final version of ¶ 13.6.

parties reached no specific agreement regarding the time of payment.

On the basis of the testimony presented, the Court cannot conclude that the length of time taken by Sun's actuaries to calculate and transfer the amount of funds was unreasonable. Koch's actuary, Brian Johnson, opined that after the data was supplied it should have taken from two to seven weeks to prepare the calculations. The data was not available until February of 1982. After the proposed calculations were finished, they were forwarded to Koch's actuary, who took about two weeks to review them. At no point did Koch object to the amount of time taken by Sun to transfer the money; rather, it accepted the money without question on the dates tendered.[6]

Plaintiff has made the argument that if Sun is not required to augment its payments with the addition of interest, the Koch pension fund will be "underfunded." In support of its argument, plaintiff makes reference to two cases decided under ERISA: *Hickerson v. Velsicol Chem. Corp.*, 778 F.2d 365 (7th Cir.1986); and *Bigger v. American Commercial Lines, Inc.*, 677 F.Supp. 626 (W.D.Mo.1988). The Court finds the following two points to be dispositive of this argument. First, the "underfunding" referred to by plaintiff undoubtedly pertains to the sufficiency of the fund to meet future demands for benefits under the plan. As described above, however, the projection of the future needs of the plan is based upon a series of assumptions, most of which undoubtedly will turn out to be inaccurate. The future adequacy of the fund is as much a function of those assumptions as it is a function of the amount initially paid in.[7]

The second point, which to the Court seems even more important, is that if the fund does turn out to be inadequate or underfunded, that is the responsibility of Koch, and not of Sun. Sun's responsibility under the contract, as discussed above, was only to provide funds in a specific amount. The contract specifically provides that as of the closing date, Koch would assume the plan. *See* plaintiff's exhibit 40, ¶ 13.7. The cases relied upon by Koch had to do with the fiduciary duty owed by an employer (such as Koch) to the beneficiaries under the plan; they do not aid in the analysis of the duties owed by two contracting parties (such as Sun and Koch) to each other. Sun's responsibilities to Koch are a function of their agreement, and are not determined by federal tax laws.[8]

The facts in this case show two sophisticated parties which were bargaining fairly and at arms' length. Each in fact appears to have driven a fairly hard bargain. There are no facts in the record that indicate fraud, mistake, or overreaching on the

---

**6.** The Court was puzzled by Brian Johnson's testimony on this subject. Johnson testified that according to his understanding of the meaning of ¶ 13.6, that section required the defendant to supply the pension fund with an amount equal to the present value of the accrued benefits as of the transfer date. Johnson stated that he knew all along that funds were not intended to be and would not be transferred on the closing date. Even in light of this, however, Johnson in March of 1982 confirmed Sun's calculations as of the *closing date,* and approved that amount for transfer. The Court is aware that Johnson is an actuary, and not an attorney. However, it notes that he was involved in the negotiations of the Acquisition Agreement and was very familiar with its terms. The Court finds it difficult to believe that Johnson would have gone through the useless (and time-consuming) gesture of making the calculations as of the *closing date* if, at that time he was convinced that that amount would not satisfy the contract.

**7.** Defendant's counsel has in fact pointed out that, depending upon the market conditions, plaintiff might in fact have been better off receiving the asset transfer later, rather than on the closing date. If plaintiff had received and invested the entire amount at the time of closing, it was just as likely that it would have lost money, as that it would have accrued interest at a rate of 10%.

**8.** By the same token, the provisions of Treas. Reg. ¶ 1.414(1)–1(b)(11) do not apply to the controversy here. These regulations govern the transfer of assets in a situation where one plan is "spun-off" from another, as here; however, they are concerned only with valuation of the assets at the point of the spinoff, for purposes of determining whether the resulting plan qualifies under the Code. The regulations cited does not address what, if any, return must be earned on plan assets *after* the time of the spinoff.

part of either party.[9] What is involved here are two companies, both of which have access to experienced legal advice, with differing legal interpretations of a particular contract provision. The different interpretations reflect different underlying intentions with respect to a particular point. There are no facts, however, that would justify this Court in holding that the contract means other than what its clear and unambiguous language directs.

In light of the foregoing, therefore:

IT IS HEREBY ORDERED that judgment on Count I of the complaint be entered in favor of the defendants, and that this count be DISMISSED.

IT IS SO ORDERED.

---

9. The statements made by Sun's representatives, to the effect that they had "put one over" on Koch, are not sufficient to suggest to the Court that Sun misled the plaintiff with regard to interest or any other issue. Any inference from this statement that Koch's negotiators were "naive," or that they would have been misled by Sun's failure to raise the subject of interest, is belied by Koch's hard bargaining with respect to the COLA.