**KOCH INDUSTRIES, INC.,**
Plaintiff–Appellee,
Cross–Appellant,

v.

**SUN COMPANY, INC., et al.,**
Defendants–Appellants,
Cross–Appellees,

and

**Champlin Refining & Chemicals, Inc.,**
Defendant–Cross–Appellee.

No. 89–2577.

United States Court of Appeals,
Fifth Circuit.

Dec. 12, 1990.

**1205**

Joseph A. Cohn, Jr., Wood, Burney, Cohn & Bradley, Corpus Christi, Tex., John A. Baughman, Carolyn Warter Goff, Pepper, Hamilton & Scheetz, Philadelphia, Pa., for Sun Co., Inc., et al.

Kelley D. Sears, Louis K. Obdyke, Michael E. Lazzo, Wichita, Kan., Shirley Selz, Gary, Thomasson, Hall & Marks, Corpus Christi, Tex., for Koch Industries.

Sloan B. Blair, Cantey & Hanger, Ft. Worth, Tex., for Champlin Refining Co., et al.

Before GARZA, JOLLY, and JONES, Circuit Judges.

EDITH H. JONES, Circuit Judge:

In two disputes stemming from its purchase of an oil refinery in Corpus Christi, Texas, Koch Industries, Inc., ("Koch") sued Sun Company, Inc., and affiliated entities ("Sun") and Champlin Petroleum Company and affiliated entities ("Champlin"), invoking the diversity jurisdiction of the federal courts. Koch sought damages from Sun for breach of contract, specifically for Sun's refusal properly to "fund" a pension plan that was transferred as part of Koch's acquisition of Sun's refinery. Koch also sought contract damages from Sun and specific performance from both Sun and Champlin for failure to honor Koch's right of first refusal on an oil storage terminal that Sun ultimately sold to Champlin.

After a bench trial of the pension fund issue, the United States District Court for the Southern District of Texas entered judgment for Sun, dismissing Koch's claim. 691 F.Supp. 1028. Regarding the right of first refusal issue, the court granted summary judgment to Sun and Champlin on Koch's claim for specific performance and dismissed Champlin from the action. After a separate bench trial, the court awarded Koch $717,085 in damages against Sun for breach of contract and subsequently amended its award to include prejudgment interest at the rate of ten percent. We conclude that Koch has proved no breach of contract and should recover nothing. We therefore affirm the district court's judgment as to the pension fund issue and the claim for specific performance, but reverse the judgment as to the right of first refusal.

## I. PENSION FUND ISSUE

Koch purchased Sun's refinery pursuant to an Acquisition Agreement dated November 10, 1981. As a consequence of the purchase, more than 500 Sun employees at the refinery became employees of Koch. In order to protect the pension benefits of these employees, the parties agreed to establish a special pension plan for them, called the Suntide Plan. Sun adopted the plan immediately prior to the transfer of the refinery, and pursuant to the Acquisition Agreement, Koch assumed the plan as of the defined "closing date," November 13, 1981. The parties agreed that Sun

would "fund" the plan—that is, transfer to it assets equal to the present value of the benefits expected to be paid to the employees as they became eligible. As a benefit to the covered employees, Sun would also transfer an amount (in present value terms) sufficient to fund increases in retirement benefits based on assumed annual cost of living increases for the employees of 6¾%.

The calculations of these two present values were to be performed by Sun employing specified actuarial assumptions and later checked by Koch. Because of the complexity of the calculations, the parties knew that Sun would not immediately transfer the funds, and they specified no date by which Sun was required to do so. Sun made the first transfer on March 18, 1982, in the amount of $3,881,707, and the second on April 14, 1982, in the amount of $5,464,523, for a total of $9,346,230. Koch accepted both payments, its actuary having confirmed Sun's calculations. Later in April of 1982, Koch wrote Sun, claiming a deficiency in the payments by virtue of Sun's failure to pay "interest" on the funds from the closing date until the dates of transfer. Sun denied any obligation to make additional payments. In this litigation, Koch makes a claim for $360,499 from Sun, relying on paragraph 13.6 of the Acquisition Agreement and on federal pension law. We dispose of the latter issue first.

### A. ERISA

█ Koch claims that Sun's refusal to pay interest violated section 208 of the Employee Retirement Income Security Act, 29 U.S.C. § 1058. Although Koch has not sought relief directly under ERISA, it asserts that ERISA is de jure part of the Acquisition Agreement, citing *Nedrow v. MacFarlane & Hays Co. Employees' Profit Sharing Plan & Trust*, 476 F.Supp. 934, 937 (E.D.Mich.1979). Assuming without deciding that ERISA is part of the Acquisition Agreement, we hold that Koch has not shown any violation of ERISA by Sun.

Section 208 provides in relevant part:

A pension plan may not merge or consolidate with, or transfer its assets or liabilities to, any other plan ..., unless each participant in the plan would (if the plan then terminated) receive a benefit immediately after the merger, consolidation, or transfer which is equal to or greater than the benefit he would have been entitled to receive before the merger, consolidation, or transfer (if the plan had then terminated).

29 U.S.C. § 1058; *see also* 26 U.S.C. § 414(*l*) (imposing same requirement for pension plan to qualify as tax-deferred retirement plan). "Because Sun did not include an additional sum for the time value of the funds transferred," argues Koch, the amount transferred was less than the employees' accrued benefits as of November 13, 1981, when the employees became covered under the Suntide Plan.

This argument confuses the two separate duties that section 208 imposes on employers who merge, consolidate, or transfer pension plans. First, employers may not by these actions decrease the "liabilities" of the plan—the benefits promised to employees upon retirement, disability, or termination.[1] That is, the promised benefits to employees must be at least as good or better under the new pension plan as under the old one. There is no dispute in this case that the affected employees will receive benefits under the Suntide Plan the same as or greater than under their former pension plan at Sun. As noted in the margin, the level of benefits does not depend on the amount of funds transferred by Sun to Koch, because the Acquisition Agreement requires that Koch satisfy any shortfalls. Thus, no matter what we decide about the amount that Sun should have

---

1. As the district court found, the Suntide Plan adopted for the former Sun employees is a "defined benefit" plan, under which the employees "are guaranteed benefits in a certain amount, based upon their salary when separated from employment, as well as upon years of service." These benefits do not depend on the current or future assets of the plan, for the employer has the obligation to satisfy shortfalls if the actuarial assumptions of the plan prove incorrect. Under paragraph 13.7 of the Acquisition Agreement, Koch agreed to "assume" the obligations of the Suntide Plan.

transferred to Koch pursuant to their *contract*, Sun did not violate this portion of section 208.

Second, in transferring the liabilities of pension plans, section 208 requires that employers also transfer sufficient plan "assets" to pay previously promised benefits to employees as they come due. Because these benefits will be paid in unknown amounts in future years, assets are deemed sufficient if they are not less than the present value of the promised benefits of the former plan. 26 C.F.R. § 1.414(*l*)–1(n)(1)(ii). The only testimony adduced at trial about such present value as applied to this case was that of Mr. Stanley Freilich, Sun's actuary. Mr. Freilich testified on direct examination that the transfer of only $4.8 million—compared to the $5,464,523 actually transferred under this provision—would have satisfied the complicated requirements of ERISA and IRS regulations. Furthermore, according to Freilich, the $5,464,523 was legally sufficient even if those regulations had required interest. Koch has offered neither evidence nor briefing to dispute this testimony.

The two ERISA cases cited by Koch do not support its contentions. *Hickerson v. Velsicol Chem. Corp.*, 778 F.2d 365 (7th Cir.1985), *cert. denied*, 479 U.S. 815, 107 S.Ct. 70, 93 L.Ed.2d 28 (1986), involved the conversion of a defined-contribution deferred profit-sharing pension plan into a defined-benefit pension plan. Under the former plan, the employer made a specified contribution to the plan, which then invested the funds as trustee; each employee had a vested interest in a pro rata portion of the trust corpus. *Id.* at 368. The court ruled that in order for the benefits under the new plan to equal these vested interests as required by section 208 of ERISA, the new plan must provide interest on then-existing employee account balances at least equal to the long-term interest rate as of the date of conversion. *Id.* at 379. In this case, employees never had individual "account balances" that depended on investment returns; instead, they have from the Suntide Plan (as guaranteed by Koch) promises to pay set levels of benefits. As stated above, these benefit levels were protected by the amount of funds transferred by Sun.

Koch's other proffered case, *Bigger v. American Commercial Lines, Inc.*, 677 F.Supp. 626, 632–33 (W.D.Mo.), *aff'd*, 862 F.2d 1341 (8th Cir.1988), ruled that even if the actual payment (transfer) of funds between pension plans takes place after the "merger, consolidation, or transfer" described in section 208, it is the former date at which the amount of funds will be judged for sufficiency under section 208. As we described, Sun's actuary testified that the actual transfer of funds from Sun to Koch was legally sufficient at either the date of closing or the date of payment. Thus, Sun's actions in this case complied with the requirements of section 208 as interpreted by *Bigger*. Because the payment of interest is not dictated by ERISA, we now look to the contract between the parties.

### B. Acquisition Agreement

 Paragraph 13.6 of the Acquisition Agreement required Sun to "fund" the Suntide Plan "as of the Closing Date" with an amount of money specified in two formulas based on agreed actuarial assumptions. Koch asserts that this provision required Sun to pay, in addition to this amount, an amount representing the time value of money between the closing date of the agreement and the date that Sun actually transferred the money. The relevant language of Paragraph 13.6 reads:

> As of the Closing Date, the Suntide Plan will provide benefits, and shall be funded by [Sun] from whatever source it chooses, with an amount equal to: (i) the present value of the Accrued Benefit accrued by the Transferred Employees as of the Closing Date ... plus (ii) the present value of a cost of living adjustment to the Accrued Benefit set forth in (i) above, equal to 6¾%, compounded annually from the Closing Date....

According to the agreement, it is to be construed in accordance with the laws of Texas. Under Texas law, "if there is no

ambiguity, the construction of the written instrument is a question of law for the court." *Westwind Exploration, Inc. v. Homestate Savings Ass'n,* 696 S.W.2d 378, 381 (Tex.1985) (quoting *City of Pinehurst v. Spooner Addition Water Co.,* 432 S.W.2d 515, 518 (Tex.1968)). At trial, both parties agreed, and the district court held, that paragraph 13.6 was not ambiguous. The parties' positions have not changed on appeal. We also find it appropriate to construe the Acquisition Agreement as a matter of law.

■ In construing the agreement, certain canons of construction are to be borne in mind. The court's role is to effectuate the intent of the parties. In so doing, we assume that the language the parties used explains their intent. Extrinsic evidence of the facts and circumstances surrounding the making of the agreement may be used to interpret the contract in light of the parties' true intentions. *Benson v. Jones,* 578 S.W.2d 480, 484 (Tex.Civ.App.1979). "Language should be given its plain grammatical meaning unless it definitely appears that the intention of the parties would thereby be defeated." *Reilly v. Rangers Management, Inc.,* 727 S.W.2d 527, 529 (Tex.1987). Finally, "courts should examine and consider *the entire writing* in an effort to harmonize and give effect to *all the provisions* of the contract so that none will be rendered meaningless." *Coker v. Coker,* 650 S.W.2d 391, 393 (Tex. 1983).

Admittedly, the placement of commas in that part of Paragraph 13.6 quoted above that precedes the colon is infelicitous. We disagree with Sun's contention that because of these commas, the initial phrase "As of the closing date" modifies only the immediately following clause "the Suntide Plan will provide benefits." Grammatically, it makes more sense that "as of the Closing Date" also modifies the following clause "shall be funded by [Sun] from whatever source it chooses." This disagreement does not, however, fully under-

mine Sun's interpretation of the contract language.

The isolated portion of the sentence relevant to our analysis reads as follows:

As of the Closing Date, the Suntide Plan will provide benefits, and shall be funded by [Sun] from whatever source it chooses, with an amount equal to [the following elaborate formula].

Koch's entire argument hinges on the paraphrased wording, "As of the Closing Date, the Suntide Plan ... shall be funded by [Sun]...." Koch contends that this language required Sun to fund the Suntide Plan in such amount *as if it were* funded on the Closing Date,[2] thus including interest for the time-value of the fund between the actual Closing Date and the date of transfer of the money several months later. Although this construction would be plausible in isolation, it does not fit the entirety of the sentence or the parties' intention when they signed the agreement.

Two facts compel a different reading of Paragraph 13.6. First, the parties knew at the time they signed the agreement that Sun could not literally "fund" the Suntide Plan for some weeks after the Closing Date because the data were not available to calculate the proper sums. Second, despite that knowledge, the parties drafted a funding provision, embodied in the rest of paragraph 13.6, that specifies in detail Sun's monetary obligation in present-value terms without providing for a time-differential between the Closing Date and the date of actual funding. Given the multi-million dollar amounts in issue, it is highly unlikely that Sun and Koch would have intentionally expressed in very complex and specific terms how much Sun must contribute in present value terms to fund future benefits, while intentionally leaving completely unexpressed a potential six-figure liability for "interest." Koch's advocacy of a ten percent (10%) interest rate, wholly unsupported by the contract language, reflects the frailty of its argument. Finally, Koch's argument that the initial clause of para-

**2.** Koch cites *United States v. Munro–Van Helms Co.,* 243 F.2d 10, 13 (5th Cir.1957), as equating "as of" with "as if it were." In light of our subsequent discussion, we see no relevance to this point.

graph 13.6 required the factoring of interest until the actual date of Sun's transfer of funds overlaps, at least in part, with the parties' calculation of present values based on the Closing Date. As the district court said, Koch could have achieved its desired result by explicitly basing the present-value calculations "as of the transfer date." That it did not do so suggests that the parties had no such agreement.

The more plausible reading of Paragraph 13.6 is that urged by Sun. Under that construction, the Suntide Plan became responsible for providing benefits "As of the Closing Date," and Sun's funding obligation "As of the Closing Date" included the present value of future benfits to the claimants plus a 6¾% annual cost of living adjustment to those benefits. The parties did not insist upon actual funding "As of the Closing Date," nor could they specify a precise transfer date for the funds.[3] Without doing violence to grammar and word usage, and taking the surrounding circumstances into account, Sun's funding "As of the Closing Date" meant only to state the intent that Sun's contribution to the Suntide Plan would be relied on from and after that date to pay benefits. Thus, if a former Sun employee reached retirement between the Closing Date and the date of transfer of Sun's funds, Koch could presumably begin to pay him without having "contributed" to the plan's funding; that is, Koch could later recapture that amount from the Sun contribution.

Remembering the last above-cited canon of construction, we reject Koch's argument that the foregoing interpretation of paragraph 13.6 conflicts with the language of paragraph 13.8, which provides: "Sellers shall transfer the account balances maintained on behalf of the Transferred Employees in Sellers' Savings Plan as of the Closing Date to Buyer's Savings Plan." Koch asserts that Sun interpreted this language in the same way that Koch has asked us to interpret the language of paragraph 13.6. That is, "Sun took into consideration earnings on funds in its savings plan from the Closing Date until the transfer date." The two paragraphs do not, however, have parallel grammar. Paragraph 13.8 requires transfer of account balances "maintained ... as of the Closing Date." But more important, the account balances were owned neither by Sun nor by Koch, but by the account holders; the accounts held either shares of stock, the value of which is self-adjusting, or dollars earning interest at a specified rate no matter who "maintained" the accounts. The account holders had a right to continue receiving whatever return they had chosen regardless of when the savings plan funds were transferred.

Because Koch has not proven its claims against Sun for breach of the Acquisition Agreement or breach of ERISA obligations, we affirm the district court's judgment on the pension fund issue.

## II. RIGHT OF FIRST REFUSAL ISSUE

Koch's complaint also sought relief against Sun and Champlin for breach of the Right of First Refusal Agreement (RFRA) entered into between Koch and Sun concurrently with the Acquisition Agreement. The RFRA covered four specific Sun properties about which Koch and Sun had negotiated but had failed to reach an agreement to sell. Sun attempted to sell these properties in 1982 and, pursuant to the RFRA, made a formal offer to sell them to Koch for $38.9 million. Koch declined the offer. In the fall of 1983, the parties discussed the sale of Sun's DeepSea terminal in Corpus Christi, one of the four properties subject to the RFRA. Again, nothing came of the discussions.

---

**3.** Of course, Sun could not have taken forever to satisfy its obligation to transfer the money. If a contract does not set a time for performance, the law will imply a duty to perform within a reasonable time; what is reasonable is a question for the finder of fact. *M.J. Sheridan & Son Co. v. Seminole Pipeline Co.,* 731 S.W.2d 620, 622 (Tex.Ct.App.1987); *Heritage Resources, Inc. v. Anschutz Corp.,* 689 S.W.2d 952, 955 (Tex.Ct. App.1985). The district court found that the volume and complexity of the required calculations rendered the time it took Sun to transfer the funds reasonable. Koch does not argue otherwise.

About this same time, Champlin entered the picture by putting up for sale its Oklahoma crude oil gathering system. Although both Koch and Sun negotiated with Champlin to buy the gathering system, it was Sun that reached an agreement with Champlin. Sun agreed to purchase the gathering system, while Champlin would have the option of purchasing the DeepSea terminal for $9.4 million in cash. Champlin's option was made contingent upon Koch's right of first refusal on DeepSea. Ultimately, Champlin exercised its option to purchase DeepSea, and Sun began the process of activating Koch's right of first refusal.[4]

On December 22, 1983, Sun sent Koch a formal offer, expressed in a previously agreed-upon format, to sell DeepSea for $9.4 million in cash. Sun sent Koch some additional materials, which were received on January 3, 1984. Although Koch repeatedly complained to Sun about formal defects in the offer, its most important objection to the offer was that it contained at least four substantial differences from Sun's agreement with Champlin, in breach of paragraph 1.9 of the RFRA. Even after a number of discussions in January of 1984, Sun and Koch never resolved their dispute. Sun sold DeepSea to Champlin on February 1, 1984, informing Koch of the sale by letter dated two days later. Koch brought this action for breach of contract a year later, on February 6, 1985. We discuss the issue of breach first, followed by the remedies of specific performance and damages.[5]

### A. Breach

Like a typical right of first refusal agreement, the RFRA ultimately did not restrict the terms on which Sun could sell DeepSea to third parties such as Champlin. Rather, the RFRA required Sun to follow certain procedures before selling DeepSea. Paragraphs 1.1 and 1.2(A) required Sun to offer DeepSea to Koch according to a certain

previously drafted "agreement of sale." Paragraph 1.2(B) gave Koch thirty days in which to accept the offer; if Koch failed to accept in that time, Paragraph 1.4(A) gave Sun thirteen months to sell DeepSea to a third party at an "equivalent price." Paragraph 1.9 contemplated that Sun and the third party might consummate a sale of DeepSea on terms different from the offer to Koch, "so long as such modifications, taken as a whole, do not have the effect of reducing the economic value to [Sun] of the transaction offered to the third party to a value less than the economic value to [Sun] of the transaction offered to Koch."

The district court concluded that Sun breached paragraph 1.9 because Sun's offer to Champlin had less economic value to Sun—that is, it was worse for Sun and presumably better for Champlin—than Sun's offer to Koch. It based this conclusion on the provision in the offer to Champlin by which Sun promised to amend a "terminalling agreement" between one of its affiliates and Champlin as the new owner of DeepSea. Under this agreement, Sun "paid" itself less than market rates to store crude oil at its own terminal. The amendment would force Sun to pay market rates to Champlin for storage. Sun's offer to Koch did not contain this promise. Koch claims that the amendment was worth $679,101 to the buyer of DeepSea. Sun contends for a value of only $151,295 and argues that the amendment affected a Sun affiliate that was not a party to the RFRA. Koch also cites other breaches by Sun of both paragraph 1.9 and other provisions of the RFRA. Without addressing each and every argument, we shall assume for purposes of review that Sun breached the RFRA. We now consider whether Koch is entitled to any remedies for this breach.

### B. Specific Performance

Prior to trial, the district court granted Sun's motion for partial summary judgment, ruling that "specific performance/re-

---

**4.** For a thorough discussion of rights of first refusal under Texas law, see this court's recent opinion in *West Texas Transmission, L.P. v. Enron Corp.*, 907 F.2d 1554, 1561–63 (5th Cir.1990).

**5.** Given our disposition of these issues, we need not discuss the difficult question of the applicable rate of prejudgment interest under Texas law.

scission is not available to [Koch]." Koch argues on appeal that this ruling is incorrect as a matter of law and cites *Gochman v. Draper*, 389 S.W.2d 571, 579 (Tex.Civ. App.1965), *rev'd on other grounds*, 400 S.W.2d 545 (Tex.1966), for the proposition that a right of first refusal agreement is a valid contract enforceable through specific performance. This proposition is surely correct, but it is just as surely limited by the subsequent decision in *Martin v. Lott*, 482 S.W.2d 917 (Tex.Civ.App.1972), which Koch fails to cite.

### 1. Election

In *Martin*, the court held that breach of a right of first refusal agreement both created an enforceable option in the rightholder and also required the rightholder to choose between exercising that option or acquiescing in the transfer of the property to the third party:

In a suit for specific performance of an agreement not to sell or transfer without first making an offer to the plaintiff, such a transfer [in violation of the right of first refusal agreement] is considered equivalent to the offer which the owner has failed to make and gives the plaintiff an election to accept or reject, that is, to purchase or decline to purchase. As in the case of any other offer specifying no time for acceptance, the power of acceptance does not continue indefinitely but terminates on expiration of a reasonable time or by express rejection, or by conduct clearly inconsistent with an intention to purchase.

*Id.* at 922 (footnotes omitted). This election requirement is consistent with the right actually conferred by a right of first refusal agreement, that is, the right to have an enforceable option to purchase the subject property upon the happening of a specified event. The holder of an option must exercise it in order to purchase the property. If he chooses not to exercise his option, he cannot complain later that the owner sold the property to a third party.

In its opinion granting partial summary judgment for Sun, the district court found that Koch "never evinced an intention ...

to accept the 'offer' made by [Sun] when [it] sold the property." As Sun points out in its reply brief, it informed Koch on February 3, 1984, of the sale of DeepSea to Champlin. Koch, however, made no mention of the sale in its June 28, 1984, letter to Sun concerning other properties covered by the RFRA, and Koch made its first post-sale objection to the transfer of Deep-Sea only on November 27, 1984, nearly ten months after learning of it. Koch filed this lawsuit on February 6, 1985, seeking to have the sale of DeepSea to Champlin "rescinded and set aside," but it did not seek or offer to buy DeepSea for itself. Finally, in response to Sun's request for admissions, Koch admitted that it "has not since December 1983 made an offer to Sun to purchase the Deep Sea Terminal." Given these facts, the district court's finding that Koch never evinced an intention to purchase DeepSea on the terms offered to Champlin is not clearly erroneous.

### 2. Knowledge of Terms

In making a remedy of specific performance contingent upon the rightholder's contemporaneous election to purchase the subject property on the terms offered to the third party, *Martin v. Lott* described this election "as a matter of intention," logically established only if the rightholder "knew about his inconsistent rights and intended to choose between them." 482 S.W.2d at 923. Without citing *Martin*, Koch essentially argues that it did not know about its rights and therefore cannot be deemed to have chosen between them. Koch does not specifically dispute the district court's finding that it did not elect to purchase Deep-Sea, but argues instead that "Koch in fact could *not* have accepted the 'offer' of Sun's property on the same terms as Sun sold to Champlin, because Koch did not know these terms, and because Sun breached its duty to provide them." We find this proposition untenable both in law and in fact.

In its opinion after a bench trial, the district court concluded as a matter of law that Sun "failed to prove that [Koch] knowingly and intentionally abandoned its right to purchase the DeepSea Terminal on

the same terms as were offered to Champlin." The court erred in so framing the issue. Under *Martin v. Lott*, the issue is whether Koch had enough information about the terms of the Champlin deal to make an informed choice about purchasing DeepSea on those terms. The court also erred in imposing on Sun the burden of proving this fact. Texas law, sparse but binding upon us, indicates that the owner has an initial duty to make a "reasonable" disclosure of the offer's terms, and the rightholder has a subsequent duty to undertake a "reasonable" investigation of any terms unclear to him. Further, this issue is governed by the established rule that the plaintiff (here Koch) has the burden to prove all predicates to the contractual liability of the defendant. *See Incorporated Carriers, Ltd. v. Crocker*, 639 S.W.2d 338, 340 (Tex.Ct.App.1982); *Howell v. Kelly*, 534 S.W.2d 737, 740 (Tex.Civ.App.1976).

In *Ellis v. Waldrop*, 656 S.W.2d 902, 903 (Tex.1983), the owner had notified the rightholder by letter of the terms of the deal with the third party, and the rightholder had replied by letter with his "objections" to the offer. The opinion does not reveal any other communication between the parties. Finding "probative evidence" in the record, the court upheld a jury's finding that the owner substantially performed his duties under a right of first refusal agreement. *Id.* at 904. In *Foster v. Bullard*, 496 S.W.2d 724, 736 (Tex.Civ. App.1972), the court overruled a contention that the rightholder was estopped to assert his right of first refusal because he did not bring suit seeking conveyence of the subject property for more than six months after the owner sold the property to a third party. The court found that the owner made "no attempt" to give the rightholder the opportunity to exercise his option to purchase. *Id.* The court also found that the rightholder made "diligent and prompt investigation ... to ascertain the facts surrounding the sale" and that his "[a]ttempts

to reach [the owner] by telephone and mail were fruitless." *Id.* at 737. Finally, the court noted that "[a]s soon as [the rightholder] was alerted to the fact that the [property] had been sold he initiated a search for the facts, an endeavor in which he was aided not at all by [the owner and the third party]." *Id.*

■ The cases cited by Koch are not to the contrary. *Sanchez v. Dickinson*, 551 S.W.2d 481, 486 (Tex.Civ.App.1977), contains the statement that the owner "is obligated to offer the holder of such [right of first refusal] an opportunity to buy the subject property on the terms offered by a bona fide purchaser. Until such time, [the rightholder] was under no duty to act." *Gochman v. Draper*, 389 S.W.2d at 579, placed "the burden on [the owner] to offer [the rightholder] a 'first refusal,' and, of course, to disclose the amount required for him to be substituted as the purchaser. Until [the rightholder] was apprised of these matters, he was under no duty to act." Koch, of course, cannot assert an utter lack of notice so as to make *Sanchez* or *Gochman* relevant. These opinions say no more than that the rightholder's duty to investigate does not arise until the owner makes reasonable disclosure of the offer.[6]

■ Applying these decisions, we conclude that Sun made a reasonable disclosure of the terms of the Champlin deal. Furthermore, because Koch did not undertake a reasonable investigation of the terms that it now alleges were unclear, Koch cannot complain that it lacked sufficient information to make an informed choice about whether to buy DeepSea on those terms. The most important reason for our conclusion is the district court's finding that on January 6, 1984, Sun sent Koch copies of the proposed "Agreement of Sale" and "Terminal Option Agreement" between Sun and Champlin. The former document, some forty-three pages with twelve exhibits, constituted in law the "of-

---

**6.** Koch also cites *Edmonds v. Houston Lighting & Power Co.*, 472 S.W.2d 797, 798–99 (Tex.Civ. App.1971), for the proposition that an offer must be "reasonably definite in its terms." We agree—and emphasize the standard "reason-

ably," in contrast to a standard that would require an owner to satisfy every last one of the rightholder's requests for clarification of the offer even *before* the rightholder made such requests.

fer" that, according to *Martin v. Lott*, Koch was required to accept or reject within a reasonable time. Despite having received this documentary notification, Koch argues vigorously that it "did not and could not know the 'price in fact' at which Sun offered DeepSea to Champlin" and that it "never knew the specific terms of Sun's sale to *Champlin.*" We cannot accept this argument.

First, paragraph 2.3 of the Agreement of Sale clearly called for a cash purchase price for DeepSea of $9.4 million. Second, Koch's knowledge of the other relevant terms is revealed in Koch's letter to Sun of January 13, 1984, the next written communication between the parties. The letter objected to Sun's proposed deal with Champlin on various procedural and substantive grounds. Koch complained that this deal, in contrast to Sun's offer to Koch, required no upward adjustment in purchase price for the cost of Sun's subsequent improvements at DeepSea; that it contained a number of warranties, guarantees, and representations by Sun; that it required no down payment of the purchase price; and that it allocated to Sun the costs of obtaining a title binder and providing a special warranty deed. What more was there to say about those terms? Admittedly, they were *different* from the terms of Sun's offer to Koch, but that fact makes them no less *specific*.[7]

The one bit of information about the Champlin offer that Koch conceivably lacked involved the rates that a Sun affiliate would continue to pay the owner of DeepSea for storage of crude oil. Koch's January 13, 1984, letter further argued: "Sun agreed with Champlin to obtain an unspecified amendment to the Terminalling and Storage Agreement between [two Sun affiliates]; our agreement makes no such requirement on Sun." As described by the district court, the amendment "would bring those rates, which were set somewhere below 'market' rates, up to market." Koch realized the amendment's potential significance as a "price term" of Sun's agreement with Champlin.[8] Even so, Koch did not ask in the letter for additional information from Sun. Indeed, Koch did not initiate any further communication with Sun until June, 28, 1984.

 In its brief, Koch now argues that it "wrote two separate letters detailing its objections to Sun's proposed sale, *in effect* inviting a response to clarify the offer." The letter quoted above, however, simply objected to the sale on various legal grounds, not on grounds that the offer was vague or ambiguous. As for the other letter, which also asked for additional information, Koch addressed it to Champlin, not to Sun. Koch's duty to make a reasonable investigation required more than sending an elliptical "invitation" to respond: it required an *actual* request for information.

Two other facts are significant on this point. First, a 1982 memorandum prepared by Koch's Chief Economic Analyst in response to a previous opportunity to buy DeepSea showed that Sun's affiliate was paying only $.15 per barrel to store crude oil at DeepSea, while two unaffiliated companies were paying $.18 and $.21, amounts greater by 20% and 40%, respectively.[9] From this fact, we infer that Koch knew, or could have closely estimated, the amount of any upward adjustment in the rate paid by the Sun affiliate to store crude oil at DeepSea after Champlin took over. Second, Koch states in its brief that it "never conducted an evaluation of whether to purchase DeepSea on the terms offered to *Champlin.*" Those terms, however, were the measure of Koch's rights against Sun. If Koch was not interested in evaluating a DeepSea purchase under those terms, per-

---

7. In fact, the provisions concerning the cost of subsequent improvements and the down payment of the purchase price make the agreement with Champlin more specific. That is, the cash purchase price would *not* be adjusted by some unknown or incalculable cost.

8. The parties dispute the amendment's ultimate value to Champlin, but even Sun admits that it was worth at least $151,295. *Id.*

9. The district court found that Sun sent Koch copies of the terminalling agreement, dated January 2, 1979, and its most recent amendment (unrelated to Champlin), dated August 26, 1983.

haps it was uninterested in any purchase of DeepSea.

On these facts, evaluated under the proper legal standard, we conclude that Sun made a reasonable disclosure of the terms of the Champlin offer and that having received this disclosure, Koch did not undertake a reasonable investigation to clarify any terms it considered unclear or ambiguous. Koch had sufficient information upon which to base a reasoned choice whether or not to exercise its option and demand to purchase DeepSea on the terms offered to Champlin. Because Koch failed to exercise its rights within a reasonable time, specific performance or rescission is not available to Koch, either from Sun or from Champlin. Thus, we affirm the district court's denial of these remedies.

### C. Damages

 Although it refused to grant Koch any equitable remedies, the district court nevertheless entered judgment against Sun and in favor of Koch in the amount of $717,085 in damages for breach of contract, plus pre- and post-judgment interest. Sun asserts that the damage award was erroneous because Koch did not fulfill its legal obligation to offer to purchase DeepSea on the terms of Sun's agreement with Champlin. Our reading of Texas law leads us to approach this issue in terms of the measure of damages.

We start our analysis of the damage award with the following basic proposition of contract law: "An award of damages for breach of contract is supposed to place the injured party as nearly as possible in the position that he would have occupied had the defaulting party performed the contract." *Thomas C. Cook, Inc. v. Rowhanian,* 774 S.W.2d 679, 686 (Tex.Ct.App.1989) (citing *Stewart v. Basey,* 150 Tex. 666, 669–70, 245 S.W.2d 484, 486 (1952)). The position that a rightholder would have occupied had the owner performed his duties under the right of first refusal agreement is that of the holder of an enforceable option to purchase the subject property on the terms of the third party's offer. In this case, had Sun complied with the RFRA, it would

have offered to sell DeepSea to Koch on terms economically equivalent to the agreement between Sun and Champlin. Koch would then have had an enforceable option to elect to purchase DeepSea on those terms within thirty days. Koch's rights are thus governed by the rule that an option holder "need not tender performance of the contract, but he must plead and prove that he was ready, willing, and able to perform in order to recover damages." *Olson v. Bayland Publishing, Inc.,* 781 S.W.2d 659, 664 (Tex.Ct.App.1989) (citing *Whitney Properties Corp. v. Moran,* 494 S.W.2d 587, 590 (Tex.Civ.App.1973)).

Courts often apply this rule to bar recovery to option holders who cannot prove that they had the financial ability to pay for the subject property at the time of the owner's breach. *See, e.g., Kanavos v. Hancock Bank & Trust Co.,* 395 Mass. 199, 479 N.E.2d 168 (1985). Likewise, an option holder who is not "willing to perform"— one who simply would have declined to exercise his option—suffers no legal damage from breach of the option contract. For the reasons discussed above in connection with Koch's knowledge of the terms of the Champlin offer, we conclude that Koch was this type of "unwilling" option holder who may not recover damages.

We rely principally on the district court's finding, approved above, that as of April 6, 1988, Koch "has never evinced an intention ... to accept the 'offer' made by [Sun] when [it] sold [DeepSea]." Further, as we have noted, Koch had, or should have had, enough information upon which to make an informed choice about exercising its implied-in-law option to purchase DeepSea. Two additional facts reinforce these conclusions. First, as the district court found, Koch's head of planning and development thoroughly analyzed Sun's December 22, 1983, offer but advised against purchasing DeepSea for $9.4 million.

Second, although Sun's opening brief asserts pointedly that "Koch did not want Deepsea," Koch's answering brief never contradicts this assertion. When pressed at oral argument to refer us to any evidence to the contrary, Koch cited only the

direct-examination testimony of Mr. Sterling Varner, Koch's then-President, that it "would have been [his] recommendation" to purchase DeepSea at any price between $8.4 and $9.4 million. On cross-examination, however, Mr. Varner admitted that he never voiced his opinion to Koch's owner or to the Koch employee whose memo advised against purchasing DeepSea. Mr. Varner explained by saying that Koch was "never at the point to ever deciding to buy this until we got all the legal angles straightened out." [10]

Koch has not pled and proved that it was ready and willing to exercise its option, as required by Texas law. Accordingly, we must reverse the district court's award of damages for breach of the RFRA.

The judgment of the district court is AFFIRMED in part and REVERSED in part.

---

10. Even if Koch had demonstrated that it would have purchased DeepSea on the terms offered to Champlin (and specific performance was not a feasible remedy), we could not approve the district court's measure of damages. The damage award was intended to reflect the difference in value to Sun of its respective offers to Koch and Champlin. Because Sun actually received over $700,000 *less* from Champlin than it would have received from Koch, the court reasoned that Koch should have been allowed to purchase DeepSea from Sun for $700,000 *less* than the terms of Sun's offer. This analysis suffers from

a major flaw: it reflects no monetary damage suffered by Koch.

If Koch had exercised its rights under the RFRA, it would have purchased DeepSea from Sun. Because Koch did not purchase DeepSea, it paid no amount at all to Sun. The damage Koch suffered, if any, resulted from its inability to profit from ownership of DeepSea. Lost profits—based on a purchase price equivalent to what Champlin paid—would thus appear to be the appropriate measure of damages, rather than the quasi-restitutionary measure chosen by the district court.